OFFSHORE LOGISTICS SERVICES, INC., Offshore Logistics, Inc., and Gulf Coast Marine, Inc.

v.

MUTUAL MARINE OFFICE, INC. and Arkwright-Boston Manufacturers Mutual Insurance Company.

Civ. A. Nos. 75–1021, 75–1036.

United States District Court, E. D. Louisiana.

July 19, 1978.

James H. Roussel, Phelps, Dunbar, Marks, Claverie & Sims, Winston Edward Rice, New Orleans, La., for plaintiffs.

Donald L. King, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, La., for defendants Mutual Marine and Arkwright.

James H. Daigle, Lemle, Kelleher, Kohlmeyer & Matthews, New Orleans, La., for defendant Southern Natural Gas Co.

## OPINION

SEAR, District Judge:

This case involves a question of insurance coverage under a policy of marine insurance.

On February 9, 1973 Milton B. Bourne, an offshore crane operator, sustained serious physical injuries aboard the M/V STONES RIVER while being transported from a rig in the Gulf of Mexico to the Louisiana coast. In June of 1974 Bourne brought suit against Offshore Logistics Services, Inc. (the successor corporation to Stones River Rentals, Inc. the owner of the STONES RIVER at the time of the accident) and against Offshore General, Inc. (the operator of the STONES RIVER on the date in question; hereinafter referred to in tandem with Offshore Logistics Services, Inc. as the Offshore group). Bourne claimed that the STONES RIVER was unseaworthy and that the master of the vessel was negligent in improperly operating the vessel and in navigating the vessel under dangerous weather conditions. Bourne subsequently added Southern Natural Gas Co. (the charterer of the STONES RIVER; hereinafter referred to as Southern) as a defendant alleging that Southern had negligently dispatched the STONES RIVER into the Gulf in rough weather.

As that case progressed the parties entered into settlement negotiations and Bourne indicated a willingness to accept the sum of $160,000 in full settlement of his claim. The defendants turned to their primary insurer Reserve Insurance Co. (hereinafter Reserve) with whom the Offshore group carried a $100,000 Protection and Indemnity policy under which Southern was named as an additional assured. Reserve agreed with the defendants that the proposed compromise was reasonable and advanced the limit of its liability under its policy towards the settlement fund. The defendants turned next to their excess insurer Mutual Marine Office, Inc. and Arkwright-Boston Manufacturers Mutual Insurance Co. (defendants in the present suit; hereinafter Mutual and Arkwright) to complete the settlement. Mutual and Arkwright concurred that the amount of the settlement was reasonable but denied that the excess policy offered coverage. To prevent the loss of the settlement, the Offshore group advanced $30,000, borrowing that sum from their insurance broker Gulf Coast Marine, Inc. (hereinafter Gulf Coast) in return for the execution of an assignment. Southern advanced the remaining $30,000 which it borrowed from St. Paul Fire & Marine Insurance Co. (hereinafter St. Paul) in return for the execution of a loan receipt. The settlement with Bourne was then consummated.

Subsequently the Offshore group and Southern brought suits against Mutual and Arkwright seeking reimbursement for the sums they had personally expended in excess of their primary policy limits. The two cases were consolidated, and all parties agreed to submit the cases for decision on the basis of the record and memoranda.

## I. *The accident*

While all parties agree that the sum accepted by Bourne in settlement of his claim was a reasonable one, the parties are in serious disagreement over the question of the distribution of fault between the Offshore group and Southern. Accordingly, my initial task is to determine who, if anyone, was at fault and then to characterize any negligence I may find to determine the application of the insurance policies at issue here.

After reviewing the deposition testimony and the exhibits, I find the facts surrounding the accident to be as follows:

On the morning of February 9, 1973 the Louisiana coast was shrouded in bad weather. Seas were running at ten to twelve feet and the winds were at thirty-five to forty miles an hour. The sky was overcast while intermittent sleet and rain fell. Ronnie Tucker, Southern's dispatcher at Amelia, Louisiana contacted Edwin Burleigh the drilling foreman for Southern at Offshore Rig Number 24 in the Gulf of Mexico and informed him that because of the rough weather the scheduled helicopter crew change for that day had been cancelled. Burleigh discussed the weather situation with Curless A. Arabie, the tool pusher for Offshore, on Rig 24 and then called both Mr. Straub Roberts (Offshore's superintendent) and Mr. Bill Jones (Offshore's manager) in Morgan City. Burleigh informed Roberts and Jones that in the opinion of himself and Arabie a crew change should and could be safely made by crew boat. Jones informed Burleigh that he would make arrangements to have a large work boat standing by at the mouth of the river to transport the crew to the rig if the weather became too rough for the smaller crew boat. Burleigh, knowing that the trip by work boat took four to five hours longer than the trip by crew boat, stated that it did not matter to him whether the actual drilling crew went on the work boat or the crew boat; however, he insisted that the special service personnel be transferred by the quickest means possible, i. e. the crew boat.

In the meantime the crew boat, the STONES RIVER, was standing by at Amelia. Although scheduled to leave at noon, departure was delayed until 1:30 p. m. because several of the crew hands were late. Before leaving the dock the captain of the STONES RIVER, Buford James Kelly, told Southern's dispatcher several times that the actual transfer from boat to rig of men and equipment could not be performed safely in the stormy weather. However, Kelly did *not* protest that the mere navigation of the STONES RIVER to and from the rig would present any particular hazard. In spite of Kelly's obvious reluctance, Southern's dispatcher under instruction from Burleigh ordered Kelly to make the trip to the rig.

The STONES RIVER proceeded to the mouth of the river where it rendezvoused with the larger work boat. There Kelly radioed the dispatcher who told Kelly to unload some equipment onto the work boat and to continue out to the rig with the men. After leaving the work boat Kelly, as was his custom, turned the wheel over to John Beal, his deckhand. Beal, unlicensed to operate a vessel, ran the boat for an hour or two but became nervous because of the rough weather. Kelly took over from Beal and ran the boat the rest of the way out to the rig. The voyage was uneventful and the STONES RIVER reached Offshore Rig 24 at about 5:30 p. m.

Although the STONES RIVER bobbed in the waves and its deck was slick with ice, the crew was transferred from boat to rig and vice versa via a personnel net without serious incident.

By the time the STONES RIVER left the rig around 6:40 the weather had worsened considerably. The seas were running at eighteen to twenty-two feet and the winds were at sixty miles an hour. In defiance of the heavy seas Kelly set out from the rig at three-quarter throttle and headed directly into the waves rather than "quartering" into them. Within ten minutes of leaving Rig 24 John Beal, the deckhand, was thrown to the ceiling of the wheelhouse by the jolting vessel and in falling injured his leg. At that point Kelly turned over the

wheel to George L. Hyde, the engineer of the STONES RIVER. Hyde was not licensed to operate a vessel and this was the first time he had had occasion to operate a crewboat of this type. Hyde cut back on the speed marginally but continued, at Kelly's direction, to buck the waves head on rather than head into them diagonally.

Meanwhile in the passenger compartment located directly behind the wheelhouse several of the drilling crew members yelled to Hyde to slow the vessel down. Although Hyde heard some of their cries he did not heed them. The passengers were tossed up and down and from side to side as the STONES RIVER plunged forward. The chairs lacked seatbelts and the only way to remain seated was to clutch an armrest or seat back. About 45 minutes out from Rig 24 Milton Bourne was thrown from his seat in the air. He fell across the right armrest of his chair and the wood frame around the seat.

After being informed of Bourne's accident Hyde cut his speed in half. This considerably reduced the tossing of the boat and the uninjured passengers were able to ride the rest of the way in relative comfort.

■ I conclude that the primary cause of Bourne's injury was the negligence of Captain Kelly in entrusting the navigation of the STONES RIVER to the unlicensed and inexperienced Hyde, in directing Hyde to buck the seas head on, and in failing to instruct Hyde to slow down to a reasonable speed. A contributing cause of Bourne's injury was the negligence of Southern's drilling foreman Edwin L. Burleigh in insisting that the STONES RIVER make the crew change in bad weather. However, the latter cause was minor compared with Kelly's outright recklessness. The division of settlement responsibility between Offshore and Southern ($130,000 to Offshore and $30,000 to Southern as discussed above) was reasonable and fairly reflects the comparative faults of the parties.

## II. *Southern's negligence*

The Offshore group's primary policy with Reserve covers, *inter alia,*

". . . all such loss and/or damage and/or expense as the Assured shall *as owners of the vessel* named herein have become liable to pay and shall pay on account of . . .

(1) Liability for loss of life of, or personal injury to, or illness of, any person . . . ."

(Emphasis supplied.) The excess policy adopted the coverage of the primary policy by reference. Both the Reserve policy and the Mutual/Arkwright policy contained clauses naming Southern as an additional assured. (Reserve policy, Exhibit A to Offshore's first memorandum; Mutual/Arkwright policy, Exhibit B to Offshore's first memorandum.)

There is no doubt that both the Reserve policy and the excess policy with Mutual and Arkwright cover Offshore's liability to Bourne. The more difficult question is whether the policies cover the negligence of Southern. To come within the umbrella of coverage Southern must become liable as an "owner" of the vessel. Was Southern acting as a vessel "owner" when its drilling foreman, Edwin Burleigh, insisted that the crewboat venture forth into the stormy Gulf?

Two Fifth Circuit cases and one district court case address this issue. In the first, *Lanasse v. Travelers Ins. Co.,* 5 Cir. 1971, 450 F.2d 580, *cert. denied,* 1972, 406 U.S. 921, 92 S.Ct. 1779, 32 L.Ed.2d 120, a seaman aboard a vessel was injured while transferring a welding machine by crane from the vessel to a platform owned by Chevron. He sued his employer the vessel owner under the Jones Act and sued Chevron under diversity. The district court in an uncontested finding ruled that the employer was not at fault and that the sole cause of the accident was the negligence of Chevron's crane operator. With this in mind the Court of Appeals faced the issue of whether Chevron was covered as an additional assured under the *vessel's* Protection and Indemnity policy—a policy similar to the Reserve policy at issue here.

"The Trial Judge was . . . right in holding that the P & I policy did not cover this claim because Chevron as an additional assured . . . did not become liable 'as owner of' the vessel. The fact findings—which no one can, or does challenge—are specific. The vessel and her crew were, on the one hand, absolved from all wrong or unseaworthiness. Chevron, on the other hand, was found at fault for the manner in which the crane was operated. The vessel offered nothing further than a condition or locale for the accident.

"There must be at least some causal operational relation between the vessel and the resulting injury. . . . [W]here injury is done through nonvessel operations, the vessel must be more than the inert locale of the injury. Nothing more occurred here, for it was Chevron's actions as a platform operator or as a crane operator that caused the harm, and that does not make it a liability of a shipowner."

*Id.* at 584.

The Fifth Circuit again considered the issue in *Wedlock v. Gulf Mississippi Marine Corp.,* 5 Cir. 1977, 554 F.2d 240. In that case the plaintiff was employed as a deckhand on a tug owned by DeFelice Marine Contractors, Inc. J. Ray McDermott & Co. chartered DeFelice's tug to tow a barge. Wedlock was injured while working on the barge when he was blinded by a beam from the tug and fell into an open hatch. He then sued both DeFelice and McDermott. McDermott cross-claimed against DeFelice under DeFelice's Protection and Indemnity policy. The district court found two proximate causes of the accident: 1) McDermott's negligence aboard the barge in leaving the hatch cover open; 2) DeFelice's negligence aboard the tug in blinding the plaintiff with the spotlight. Considering the cross-claim and the coverage of the insurance policy the Fifth Circuit said:

"That McDermott was an 'additional assured' under DeFelice's policy covering the tug is undisputed. There is no question that McDermott was protected from liability arising from the operation of the tug to the same extent as DeFelice. The question here is, rather to what extent DeFelice's policy covered McDermott's liability with respect to the barge."

*Id.* at 242.

"Both McDermott and DeFelice were negligent in causing [plaintiff's] accident—McDermott in respect of the barge, DeFelice in respect of the tug's crew. We find nothing in the insurance policy or the record to indicate that by insuring the tug DeFelice's insurers intended to insure against McDermott's negligence as a bargeowner."

*Id.* at 243.

■ Both *Lanasse* and *Wedlock* are easily distinguished from the case at hand. In each of those cases there was no "causal operational relation between the vessel and the resulting injury." *Lanasse, supra,* at 584. In *Lanasse* the injury was precipitated through negligent operation of a platform-based crane. In *Wedlock* the relevant negligence (open hatch cover on barge) occurred entirely on board the barge, not the vessel. In the present case however, the negligence of Southern was definitely vessel related—the vessel itself was the instrument of the accident. The fact that the decision to dispatch the crew boat was made on fixed ground hardly detracts from the maritime vessel-centered character of the negligence. It was no fortuity that the accident occurred aboard the vessel, for the very risk incurred by Southern in its decision to send the boat into the Gulf was that the stormy weather conditions would cause an injury aboard the vessel. (Certainly it cannot seriously be argued that Louisiana rather than maritime law applies. The test of admiralty jurisdiction is clearly met since the situs of the injury was on navigable waters, and the negligence bore a significant relationship to traditional maritime activity. *Executive Jet Aviation, Inc. v. Cleveland,* 1972, 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454.)

■ However, the inquiry as to coverage does not end with a determination that Southern's negligence was vessel related.

The more thorny question, as posed above, is whether Southern acted as a vessel "owner". *Dow Chemical v. Tug Thomas Allen,* E.D.La.1972, 349 F.Supp. 1354, indicates a negative answer. That case began as a suit by a seaman to recover for injuries sustained in a fire aboard a barge being towed by a tug. The court concluded that there were two proximate causes of the accident: 1) the negligent insistence of the barge owner Dow Chemical Co. that the tug proceed with the barge into a dangerous and unchartered area; 2) the negligence of the captain of the tug in actually navigating the flotilla through the area without a guide boat or chart. The question then arose whether the tug's Protection and Indemnity policy covered Dow as an additional assured:

> "Although the tug's P & I policy names Dow as an additional assured, the coverage afforded thereunder is limited to the assured's liability 'in respect of' the insured vessel, i. e., the Tug THOMAS ALLEN. Dow, therefore, is afforded no coverage under this policy except with respect to fault on the part of the THOMAS ALLEN or the negligence of her crew. Dow's liability in this case arises from its negligence as a barge owner, or more importantly, a service company anxious to perform services for its customers without a delay. No such coverage was provided by [the insurers]."

*Id.* at 1364–65.

*Dow Chemical,* although a district court case never formally reviewed by the Fifth Circuit, was quoted by that Court in the *Wedlock* case with some measure of approval and thus may carry some precedential thrust. However, I believe that *Dow Chemical* is also distinguishable from this case (although the distinctions are not as obvious as those regarding *Wedlock* and *Lanasse* ). This as well as consideration of the charter and operating agreements between Offshore and Southern lead me to the conclusion that Southern's negligence was indeed that of a vessel "owner".

The insurance policy in *Dow Chemical* insured Dow the barge owner for its liability "in respect of" the insured vessel. Therein lies the first distinction. In this case the policy is far more particular, insuring Southern's liability "as *owner* of the vessel". Secondly, some importance must be attached to the fact that in *Dow Chemical* two separate vessels were involved, a tug and a barge, whereas here only a single vessel is involved. Lastly and most significantly, in *Dow Chemical* the relation between Dow and the owner of the tug was established by a towing contract—the terms of which are not discussed or enumerated in the opinion. In *this* case the agreements between Offshore and Southern manifest an intimate affiliation and indicate an intent to constitute Southern as the owner *pro hac vice* of the STONES RIVER.

There are three agreements between Offshore and Southern. The first agreement, the "Daywork Contract", is not particularly relevant to the problem at hand. (Exhibit 1 to Southern's first memorandum.) The second agreement, entitled "Blanket Bareboat Charter", is a fairly typical demise or bareboat charter by which Offshore chartered to Southern certain vessels including the STONES RIVER. (Exhibit 2 to Southern's first memorandum.) By the third agreement, entitled "Blanket Operating Agreement" Southern hired Offshore as an independent contractor to "man, operate, victual, maintain, navigate and supply" the vessels which Southern had chartered from Offshore. (Exhibit 3 to Southern's first memorandum.)

■ Long ago it was established beyond all question that a demise charterer is considered the owner of the vessel *pro hac vice*. *Leary v. United States,* 1872, 81 U.S. 607, 610, 14 Wall. 607, 20 L.Ed. 756; *Reed v. United States,* 1871, 78 U.S. 591, 601, 11 Wall. 591, 20 L.Ed. 220. The test of a true demise charter is control:

> "[I]f the owner retains control over the vessel, merely carrying the goods furnished or designated by the charter, the charter is not a demise; if the control of the vessel itself is surrendered to the charterer, so that the master is his man

and the ship's people are his people, then we have to do with a demise."

Gilmore & Black, Admiralty § 4–21 (2d ed.).

I find that the Blanket Charter between Offshore and Southern was a true demise. The legal effects of such an agreement are so clearly established in the jurisprudence that it is inconceivable that the parties could have intended otherwise when they put their signatures to the agreement. The fact that certain vessel related functions were returned to the owner, Offshore, as an independent contractor under the Blanket Operating Agreement does not destroy the effect of the demise charter. It is possible for a shipowner to supply the officers and crew of a vessel and the transaction still be held a demise. Baer, Admiralty Law of the Supreme Court § 12–2 (2d ed.) and cases cited therein.

In short, Southern's negligent acts were committed as owner *pro hac vice* and therefore are covered by the terms of the Mutual/Arkwright excess policy.

### III. *Protest clause*

Defendants argue that Southern must bear the entire burden of liability because of a clause in the Blanket Operating Agreement which states:

"Notwithstanding anything to the contrary herein, it is agreed that if any operation, voyage, movement, activity or inactivity on the part of OPERATOR [Offshore] and/or the vessel is insisted upon by the CHARTERER [Southern], its agents, employees, or representatives, and undertaken by the Master of the vessel under protest on account of the opinion of the Master that said operation, voyage, movement, activity or inactivity is hazardous and likely to cause loss, damage or expense, or loss of life or personal injury, the responsibility for such loss, damage or expense, or loss of life or personal injury, shall thereupon become and remain solely upon CHARTERER [Southern]."

I find, however, that the clause did not operate in this instance for two reasons. First the statements of the captain of the STONES RIVER were insufficient to activate the clause. His protestations were directed only toward the actual transfer of men and equipment between boat and rig, not to any danger that might be encountered in traveling over the rough seas.

"Q: At that time did you have any reservations or did you discuss with Rig 24, with anybody, about merely navigating the vessel being unsafe?

A: I don't believe so.

Q: So your main topic of conversation with Rig 24 was that you thought it was unsafe to transfer persons from the boat to the rig and vice versa.

A: Yes."

(Deposition of Buford James Kelly, p. 120.)

Secondly, even had an effective protest been lodged, liability flowing from the independent negligence of Captain Kelly in improperly navigating the STONES RIVER would not have been shifted under the clause. The law is clear that absent an unequivocally expressed intention, parties to a contract do not undertake to indemnify one another against the consequences of the other's own negligence. *United States v. Seckinger,* 1970, 397 U.S. 203, 90 S.Ct. 880, 25 L.Ed.2d 224; *Transcontinental Gas Pipeline Corp. v. Mobile Drill Barge Mr. Charlie,* 5 Cir. 1970, 424 F.2d 684, *cert. denied,* 400 U.S. 832, 91 S.Ct. 65, 27 L.Ed.2d 64.

Accordingly, each negligent party must bear its share of liability proportionately.

### IV. *Other insurance of Southern*

Besides being covered in the Reserve primary Protection and Indemnity policy to which defendant's policy was excess, Southern also carried a general Property & Liability Insurance policy with St. Paul Fire & Marine Insurance Co. which offered similar coverage. Therefore, it is necessary to determine which company should shoulder Southern's loss or in what proportions each should contribute to it.

█ Most insurance policies contain some sort of "other insurance" clause which provides what is to be done when two separate policies offer coverage for the same liability. These "other insurance" clauses generally fall into three categories: escape, excess, and pro rata clauses. The escape clause renders the policy in which it is contained completely inapplicable if other insurance exists. The excess clause renders the policy excess to the other insurance. And the pro rata clause provides that the two policies contribute to the loss in proportion to their limits of liability. Within these three categories innumerable variations exist.

Difficulty is encountered when each of the two applicable policies contains an "other insurance" clause. In that instance, the court must decide which clause should be given effect or whether the clauses are to be deemed mutually repugnant.

█ Before reaching the conflict between the St. Paul and Reserve "other insurance" clauses, a conflict within the Reserve policy itself must be resolved. The Reserve policy contains *two* "other insurance" clauses. The first, set forth on the second page of the policy reads in pertinent part:

"(a) If an interest insured hereunder is covered by other insurance which attached prior to the coverage provided by this Policy, then this Company shall be liable only for the amount in excess of such other insurance; the Company to return to the Assured premium equivalent to the cost of the prior insurance at this Company's rates."

A printed P & I insert attached to the end of the Reserve policy reads in part:

"Provided that where the Assured is, irrespective of this insurance, covered or protected against any loss or claim which would otherwise have been paid by the Assurer, under this policy, there shall be no contribution by the Assurer on the basis of double insurance or otherwise."

In short, the Reserve policy contains both an escape clause and an excess clause. The conflicting clauses create an obvious ambiguity in the Reserve policy. "[W]hile it is the duty of the Court to construe the insurance policy as written and not to rewrite it and thus make a new contract for the parties, ambiguous provisions will be given a meaning most favorable to the insured and exclusions from and exceptions to undertakings by the insurer are not favored." *Eipp v. State Farm Mutual Automobile Ins. Co.,* D.Nev.1976, 429 F.Supp. 674. *See also Rouse v. Greyhound Rent-A-Car, Inc.,* 5 Cir. 1975, 506 F.2d 410. Since the excess clause is more favorable to the insured than the escape clause, I conclude that the excess clause on the second page of the Reserve policy shall be given effect over the escape clause in the P & I insert.

The St. Paul policy provides in part:

"Other insurance. This policy is excess over other valid and collectible insurance, except for policies in excess of the limits of liability provided under this policy."

The effective date of endorsement of the St. Paul policy is July 25, 1971. The effective date of the Reserve policy is December 31, 1973.

█ A review of the jurisprudence reveals as many differing views on reconciling conflicting "other insurance" clauses as there are variations on the three standard provisions. There appears to be no case dealing with the two precise clauses in question here. However, I believe the best view is typified by cases such as *St. Paul Fire & Marine Ins. Co. v. Garza County Warehouse & Marketing Association,* 5 Cir. 1937, 93 F.2d 590, *United States v. Trinity Universal Ins. Co.,* 5 Cir. 1972, 457 F.2d 950, and *Viger v. Geophysical Services, Inc.,* W.D.La.1972, 338 F.Supp. 808, aff'd 5 Cir., 476 F.2d 1285. In each of these cases the court attempted through careful analysis to reconcile and give full effect to both of the clauses where possible, instead of seizing upon the convenient but often facile solution of dividing or prorating liability between the two companies.

The Reserve policy provides that when the insured is covered by other insurance which attached prior to the Reserve coverage (as did the St. Paul policy), the Reserve policy is deemed *excess* to the prior coverage. The St. Paul policy provides that it is excess over other collectible insurance, except for policies which are excess to it. Since the Reserve policy by its terms is excess to the St. Paul policy, it falls within the latter exception. Accordingly, it is not "other valid and collectible insurance" within the meaning of St. Paul's "other insurance" clause. Therefore, the St. Paul policy attaches to cover Southern's liability of $30,000. Since the $30,000 is well within the limits of the St. Paul policy ($250,000) there is no need for the now "excess" Reserve policy to come into play.

## V. *Real party in interest*

The plaintiffs in the first of these two consolidated cases, Civil Action 75–1021, are Offshore Logistics Services, Inc., Offshore Logistics, Inc. (heretofore referred to collectively as the "Offshore group") and Gulf Coast Marine, Inc. By a document entitled "Assignment" executed in March of 1975 the Offshore group assigned to Gulf Coast all "right, title, and interest" to any claims or causes of action that the Offshore group had or could possibly have in litigation arising out of the Bourne accident. (Exhibit C to Offshore's first memorandum.) Consideration for the assignment was the sum of $30,000 which was advanced in settlement of Bourne's claim. There is no question that the assignment is valid and complete.

■ Defendants contend that the claims of the Offshore group must be dismissed because they are not real parties in interest, having assigned their claim to Gulf Coast.

Rule 17(a) of the Federal Rules of Civil Procedure provides "Every action shall be prosecuted in the name of the real party in interest." Under present law an assignee is owner of an assigned claim and so is considered the real party in interest. *La-Tex Supply Co. v. Fruehauf Trailer Division,*

*Fruehauf Corp.,* 5 Cir. 1971, 444 F.2d 1366, *cert. denied,* 404 U.S. 942, 92 S.Ct. 287, 30 L.Ed.2d 256. Provided the assignment is a full and complete one, as is the case here, the assignor may not bring suit itself. *Portland Baseball Club, Inc. v. Kuhn,* 9 Cir. 1974, 491 F.2d 1101.

Accordingly, Gulf Coast is the only proper plaintiff in Civil Action 75–1021, and the claims of the Offshore group should be dismissed.

There is also dispute over the identity of the real party in interest in Southern's action, Civil Action 75–1036. However, the question in that case is moot since I have determined that Southern's liability is not covered by the defendants' policy.

## VI. *Proper defendant*

■ There are two defendants in each of these consolidated cases. Defendants argue that the excess policy at issue here is issued by Arkwright-Boston Manufacturers Mutual Insurance Co. alone and that Mutual Marine Office, Inc., the second defendant "is not an insurance company and can have no possible liability here." (Mutual and Arkwright's first memorandum, p. 2.) Plaintiffs have offered no evidence in support of the bare assertion that Mutual Marine Office, Inc. *is* an insurance company and so have not carried their burden of proof. Furthermore, an examination of the policy itself indicates that Mutual Marine Office, Inc. is not the insurer and should be dismissed from the case. (Excess policy, Exhibit B to Offshore's first memorandum.)

## VII. *Late notice*

The last page of the excess policy contains the following provision:

"The Assured, upon knowledge of any occurrence likely to give rise to a claim hereunder, shall give immediate written notice thereof to the Company."

Defendants contend that since the excess underwriter was not put on notice of the claim until almost 18 months after Bourne's injury, the policy is void for late notice.

The accident occurred on February 9, 1973. Bourne filed suit on July 3, 1974. Notice was given to defendants on July 31, 1974. Plaintiffs deny that they were aware of the severity of Bourne's injuries or that he would make a claim until suit was filed. (Offshore's first memorandum, p. 5.)

Assorted correspondence introduced by defendants belies the Offshore group's contention in part. (Exhibits A–I to Mutual and Arkwright's supplemental memorandum.) The Offshore group *was* aware of Bourne's injuries and of the possibility of suit within two months of the accident. However, they were *not* aware of the severity of the injuries, estimating the claim at most to be in the neighborhood of $25,000. Since the primary policy with Reserve covered the first $100,000 worth of liability on the accident, it is reasonable to assume that the Offshore group in good faith had no idea that it would have to call on defendants' excess policy.

The majority rule seems to be that even if it is shown that notice was late under the terms of the policy, the claim must nonetheless be paid unless it is demonstrated that the insurer was actually prejudiced by the delay. *Travelers Indemnity Co. v. Gulf Weighing Corp.*, E.D.La.1972, 352 F.Supp. 335; *Heinbaugh v. Federal Ins. Co.*, La. App., 1 Cir. 1973, 281 So.2d 839; *Miller v. Marcantel*, La.App., 3 Cir. 1969, 221 So.2d 557. Defendants here have not proved or even alleged such prejudice. Therefore, the late notice argument must be rejected.

VIII. *Expenses and attorney's fees*

Plaintiffs also claim that they are entitled to reimbursement for attorney's fees and expenses incurred in defending against Bourne's claim. The Offshore group argues, "Pretermitting those cases involving a direct action, which was not asserted in this case, the law is clear that the limit of liability under a primary Protection and Indemnity policy is inclusive of the costs and expenses of defending the main demand." (Offshore's first memorandum, p. 6.) Examination of those cases cited by the

Offshore group, however, reveals that this proposition is incorrect. In each instance those cases turned on the specific policy language and did not state any general rule of law. *Geehan v. Trawler Arlington, Inc.*, 1 Cir. 1976, 547 F.2d 132; *Board of Commissioners of the Port of New Orleans v. M/V RACHEL GUIDRY*, E.D.La.1977, 425 F.Supp. 661. *McKeithen v. S. S. Frosta*, E.D.La.1977, 430 F.Supp. 899, did not address the issue and is irrelevant.

In this case both the Reserve primary policy and the Arkwright excess policy contained provisions specifically *excluding* such costs from coverage:

"[N]o liability shall exist under this provision for:

  .    .    .    .    .

(14) Costs, charges, and expenses, reasonably incurred and paid by the Assured in defense against any liabilities insured against hereunder in respect of the vessel named herein, subject to the agreed deductibles applicable, and subject further to the conditions and limitations hereinafter provided."

(Reserve policy, Exhibit A to Offshore's first memorandum.)

"The company shall not be called upon to assume charge of the settlement or defense of any claim made or suit brought or proceeding instituted against the Assured. . . ."

(Arkwright policy, Exhibit B to Offshore's first memorandum.)

In light of these express provisions, plaintiffs' claim for expenses and attorney's fees must be denied.

IX. *La. R.S. 22:658*

Plaintiffs also seek penalties, expenses, and attorney's fees under the terms of La. R.S. 22:658, which permits the court to make such assessments when an insurance company arbitrarily refuses to pay a claim. Being penal in nature, this statute is subject to strict construction. *Steadman v. Pearl Assurance Co.*, 1961, 242 La. 84, 134 So.2d 884; *Blackwell v. Daigle*, La.App., 3 Cir. 1975, 317 So. 2d 18.

Obviously the failure to pay Southern's claim cannot have been arbitrary, since I have determined that Southern's loss should be borne by its other insurer, St. Paul Insurance Co. The failure to pay the Offshore group's claim was not in my estimation arbitrary because a very real question existed concerning the late notice issue. Defendant's failure to pay the Offshore group cannot be deemed capricious when defendant sincerely believed it had a legal defense to the Offshore group's claim—a legal defense which was *not* patently frivolous.

Judgment shall be entered in accordance with the foregoing opinion.