TIDEX, INC., et al.

v.

A.L. COMMERCIAL BLASTING
CORP., et al.

Civ. A. No. 80–4324.

United States District Court,
E.D. Louisiana.

June 27, 1983.

Thomas J. Wagner and Michael H. Bagot, Jr., Phelps, Dunbar, Marks, Claverie, New Orleans, La., for plaintiffs and Pental Ins. Co., Ltd.

Joseph B. Ortego, Young & Burson, Ltd., Eunice, La., for all defendants.

Robert M. Contois, Jr., Robert T. Lemon, II, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, La., for United General Ins. Co.

## OPINION

ARCENEAUX, District Judge.

This suit in admiralty was filed on the anniversary date of the sinking of the M/V

SOUTH TIDE in the Gulf of Mexico. Plaintiffs, TMS Acquisition Corporation ("TMS") and Tidex, Inc. ("Tidex") originally sought recovery for loss of vessel, search and location expenses, and certain hire and operating charges from defendants Oilfield Marine, Inc. and its predecessor corporation, A.L. Commercial Fabricating and Blasting Corporation (hereinafter jointly referred to as "Oilfield Marine"). Oilfield Marine had bareboat chartered the vessel from TMS and simultaneously entered into an operating agreement with Tidex in order to engage the vessel in offshore painting and sandblasting activities undertaken pursuant to a contract with Southern Natural Gas.

When the September, 1981, trial date approached, counsel for these primary parties entered into a settlement of the claims involved in this litigation. Under the terms of the compromise, Oilfield Marine was to "pay" 80 percent of the total claim for the value of the vessel ($300,000) plus search and location expenses ($128,328.51). However, it was further agreed that Oilfield Marine, whose solvency at the time was questionable, would not be personally liable for those amounts. Rather, the parties agreed that payment would be funded from insurance proceeds. Oilfield Marine's future function as a party was to "pursue" its claim against the insurer.

Plaintiffs simultaneously amended their complaint to add United General Insurance Company ("United General"), the comprehensive general liability and contractual liability insurer of Oilfield Marine, as a party defendant; Oilfield Marine then cross-claimed against United General. Thereafter, United General impleaded Pental Insurance Company, Ltd. ("Pental"), the hull insurer of the M/V SOUTH TIDE and an affiliate of the plaintiff corporation.

The central issue remaining in this suit is the alleged obligation of United General to pay monies under the compromise judgment. Plaintiffs' theory of recovery focuses on the reasonableness of the settlement reached with Oilfield Marine in this matter.

Plaintiffs allege that United General cannot collaterally attack the settlement because it wrongfully denied coverage, thereby invoking the rule of law set forth in *Parfait v. Jahncke Service, Inc.,* 484 F.2d 296 (5th Cir.1973). Oilfield Marine effectively adopts plaintiffs' position.

United General argues that plaintiffs' contractual arrangement for their vessels, which seeks to protect their own hull insurance from loss, is so indirect and convoluted that it does not accomplish its purpose in this instance. In addition to denying coverage, potential liability and reasonableness of the settlement, United General contends that Oilfield Marine is not the real party in interest in the suit relative to the amounts allegedly owed by it to the plaintiffs under the settlement. It further contends that United General cannot be sued directly for the losses because the claims arise out of contract and are precluded by the Louisiana Direct Action Statute. La.Rev.Stat. 22:655. United General also maintains that Tidex, as operator of the vessel, has no claim for loss of the vessel or search and location expenses, and is improperly made a plaintiff in this matter.

The parties agreed to submit this matter to the Court on briefs, exhibits and deposition testimony.

## THE ACCIDENT

The facts presented to the Court relative to the accident and causation are sketchy. The eyewitness deposition testimony clearly shows that on November 5, 1979, the M/V SOUTH TIDE twice attempted to moor alongside a Southern natural gas platform. Her initial attempt was made in the early morning amidst 15–20 mph winds and 4–6 foot seas; the vessel pulled away after a mooring bit broke. Tidex's Captain Daniel Tyler decided to hold off any further attempts to moor the vessel to the platform pending safer conditions.

The Oilfield Marine supervisor, Victor Fontenot, was anxious to begin operations

on the platform, and repeatedly asked Captain Tyler during this waiting period if mooring could be accomplished. Shortly after 9:30 a.m., the decision to tie up the rig in order to unload a compressor was made. Not surprisingly, testimony relative to this decision is in conflict.

Mr. Fontenot testified that he never insisted that the captain keep the vessel at the platform if the captain felt the vessel's safety would be jeopardized; he understood the captain to be ultimately in charge of the vessel. Fontenot recalled the weather at the time of the accident as fair.

Captain Tyler's testimony reflects an overriding awareness of his responsibility for all final decisions regarding vessel safety. Although he testified that he objected to the second attempt to moor the vessel to the rig, this Court finds that this testimony is totally discredited by his contradictory testimony that he felt the seas had subsided to a point where the compressor could be safely offloaded and that he had tied up without mishap in worse conditions. He stated that the seas had died, and were running 2–3 feet.[1]

After the M/V SOUTH TIDE had been alongside the platform for about 10 minutes, she was rocked by a freak 4–6 foot swell which caused the boat to strike the underwater structure of the platform on recoil of its mooring lines. She immediately took on water and, after safe evacuation of the crew, the M/V SOUTH TIDE sank in approximately 200 feet of water. After search and location efforts were made, plaintiffs determined that the sunken vessel would not be raised.

Under these facts, the Court can easily find that Oilfield Marine is totally free of tortious liability for the sinking.

## THE CONTRACTS

Under the terms of the bareboat charter drafted by TMS, full control of the M/V SOUTH TIDE was transferred to Oilfield Marine. Nonetheless, TMS obligated itself to furnish hull insurance on the vessel. (Exh. Tidex–3; Exh. U.G.–1).

However, under the operating agreement drafted by Tidex, exclusive control and command of the vessel were transferred to Tidex. Provisions contained therein specify the following relevant instances wherein liability is contractually assumed or indemnity is owed:

VI. The operation, navigation and management of the vessel shall be under the exclusive control and command of OPERATOR. Subject always to the right of the master of the vessel to determine whether a movement may be undertaken, the vessel will be operated and services herein described will be rendered at times as requested by CHARTERER. OPERATOR is an independent contractor and neither it nor its employees are servants, agents or employees of CHARTERER, CHARTERER being interested only in the completed performance of the services herein provided.

Notwithstanding anything to the contrary herein, it is agreed that if any operation, voyage, movement activity or inactivity on the part of OPERATOR and/or the vessel is insisted upon by the CHARTERER or its representative, and undertaken by the master of the vessel under protest on account of the opinion of the master that said operation, voyage, movement, activity or inactivity is hazardous and likely to cause loss, damage or expense, or loss of life or personal injury, the liability for such loss, damage or expense, or loss of life or personal injury, shall thereupon become and remain solely CHARTERER'S.

XIX. Neither OPERATOR, the owner of the vessel, their employees, the ves-

[1] The Court further finds that Captain Tyler's testimony relative to pre-accident "threats" and post-accident "admissions" by Fontenot are likewise discredited as self-serving statements from a witness whose testimony is impeachable. As a result, the actuality of these statements has not been successfully established as true.

sel, its master and crew, nor their respective underwriters shall have any liability for injury to, illness or death of any person or for damage to or loss of any property arising out of or from the operations of CHARTERER, or for any and all loss or damage sustained by the platform(s) upon which CHARTERER is performing work, or for loss of or damage to the vessel(s) which damage is sustained as a result of the vessel(s) maneuvering near or being tied to the platform(s) on which CHARTERER is performing work, howsoever caused or occurring, whether through the negligence in whole or in part of OPERATOR, the owner of the vessel, their employees, the master and crew, unseaworthiness of the vessel, or otherwise. CHARTERER agrees to protect, defend, indemnify and hold harmless OPERATOR, the owner of the vessel, their employees, the vessel, its master and crew, and their respective underwriters from and against any and all claims, suits, losses, liabilities, demands, costs, damages, or expenses.

(Exh. Tidex-3; Exh. U.G.–2).

 This Court recognizes that "a contractual provision should not be construed to permit an indemnitee to recover for its own negligence unless the Court is firmly convinced that such interpretation reflects the intention of the parties." *United States v. Seckinger,* 397 U.S. 203, 211, 90 S.Ct. 880, 885, 25 L.Ed.2d 224 (1970), *Ortiz v. ETPM– USA, Inc.,* 553 F.Supp. 549 (S.D.Tex.1982). Because of judicial reluctance to place the burden of negligence upon one not actually at fault, especially where there is disparity in bargaining power and economic resources, the Court requires "clear and unequivocal" language stating the indemnitee's intention to be held harmless for his own negligence in order to shift responsibility. At the same time, ambiguities in contractual provisions are to be construed against the party who prepared the agreements. Plaintiffs solely authored both the

bareboat charter and the operating agreement as a package to Oilfield Marine.

While this Court perceives uncertainty under the operating terms set forth hereinabove, as it relates to the obligation of Oilfield Marine to indemnify Tidex for vessel loss near a platform when occasioned by the operator's negligent decision to moor in unsafe seas, United General has not rested its defense on this ground. Rather, it argues that these provisions of the bareboat charter and operating agreement, when read in conjunction with relevant insurance policy provisions, show an overriding intention among the parties that coverage for the loss of the vessel was to be found in the hull insurance.

The United General Liability Policy No. GAM0604041 (Exh. Tidex–11; Exh. U.G.–7; Exh. O.M.I.–1) issued to Oilfield Marine at relevant times contained the following endorsement effective November 1, 1979:

It is agreed for the premium charged that Exclusion "e" of the Comprehensive General Liability insurance coverage part, and Exclusion "o" of the Contractual Liability Insurance coverage part, does not apply to non-owned watercraft.

It is the intent of this endorsement to provide coverage only for non-owned watercraft, which for the purposes of this agreement are deemed to specifically exclude the following watercraft: (none listed).

Exclusion "e" of the Comprehensive General Liability insurance reads:

(e) to bodily injury or property damage arising out of the ownership, maintenance, operation, use, loading or unloading of

(1) any watercraft owned or operated by or rented or loaned to any insured, or

(2) any other watercraft operated by any person in the course of his employment by any insured;

but this exclusion does not apply to watercraft while ashore on premises

owned by, rented to or controlled by the named insured;

Exclusion "o" of the Contractual Liability coverage reads:

This insurance does not apply:

(*o*) to bodily injury or property damage arising out of construction, maintenance or repair of watercraft or loading or unloading thereof;

The following exclusions remained in the policy under the Comprehensive General Liability coverage:

(k) to property damage to

(1) property owned or occupied by or rented to the insured,

(2) property used by the insured, or

(3) property in the care, custody or control of the insured or as to which the insured is for any purpose exercising physical control;

but parts (2) and (3) of this exclusion do not apply with respect to liability under a written sidetrack agreement and part (3) of this exclusion does not apply with respect to property damage (other than to elevators) arising out of the use of an elevator at premises owned by, rented to or controlled by the named insured:

 \* \* \* \* \* \*

(g) to property damage to

(1) property owned or occupied by or rented to the insured,

(2) property used by the insured, or

(3) property in the care, custody or control of the insured or as to which the insured is for any purpose exercising physical control;

It is clear to the Court that the United General policy endorsement modifies exclusions "e" and "o" only as they pertain to non-owned watercraft; in all other respects these and other exclusions in the policy remain unaffected by the endorsement.

■ Because a bareboat or demise charter characteristically transfers control over the vessel, the charterer is considered the owner of the vessel *pro hac vice* for liability coverage purposes even where certain vessel related functions are returned to an affiliate of the shipowner. *Offshore Logistics Services, Inc. v. Mutual Marine Office, Inc.*, 462 F.Supp. 485 (E.D.La.1978). The bareboat charter *sub judice* effectively endowed Oilfield Marine with the control and ownership explicitly excluded from coverage under the United General policy and endorsement. The Court further notes that United General's argument that protection and liability policies characteristically do not insure against loss of, or damage to, property owned or rented by the insured is basic and persuasive, particularly when viewed against the background of remaining exclusions (k) and (g). TMS's obligation to provide hull protection survived the contractual maze created by plaintiffs and such loss would more logically fall therein.

## CONCLUSIONS

Plaintiffs' and Oilfield Marine's theory of recovery is based on a legal maxim that indemnity is generally owed to a person who, in whole or in part, has discharged a duty which is owed by him but which as between himself and another should have been discharged by the other, unless the payor is barred by the wrongful nature of his conduct. *Wisconsin Barge Line, Inc. v. Barge Chem 300*, 546 F.2d 1125 (5th Cir. 1977) (citing A.L.I. Restatement of Restitution, § 76). Such wrongful conduct can include fraud or collusion. *Wisconsin Barge, supra* at 1129.

■ Although generally an indemnitee must establish actual liability on its part to recover payment from an indemnitor, an exception exists where either (1) defendants tender the defense of the action to the indemnitor, (2) the claim for indemnity is founded upon a judgment, or (3) the defendant's claim is based on a written contract of insurance of indemnification. *Terra Resources, Inc. v. Lake Charles Dredging*

*& Towing, Inc., et al.,* 695 F.2d 828 (5th Cir.1983); *Wisconsin Barge, supra* at 1127. In such excepted situations, the indemnitee need only establish potential liability to recover indemnity. Although not named as a party in this litigation during settlement negotiations, the Court concludes that United General was sufficiently aware of its involvement so as to require a showing of the potential liability of Oilfield Marine.

Therefore, in order to recover the settlement from United General, the plaintiffs and Oilfield Marine must establish (1) potential liability of the assured, (2) reasonableness of the settlement and (3) the existence of an indemnity relationship, (i.e. coverage). *Parfait, supra.*

As observed heretofore, the Court does not believe that Oilfield Marine was exposed to tort-based liability for the vessel loss, and does not find coverage for such loss under relevant contractual and policy provisions. However, since Oilfield Marine's contractual exposure as a basis of liability was not contested, the Court will assume that contractual liability and coverage [2] have been established, and focuses now on what it considers the critical dispute *sub judice:* the reasonableness of the settlement.

In this regard, plaintiffs and Oilfield Marine must satisfy the Court that Oilfield Marine "had acted in accordance with equitable indemnity principles in making the settlement and had not spent its indemnitor's money too freely". *Parfait, supra* at 301. In addition to considering whether the settlement was reasonable in amount, the Court should also consider circumstances suggesting unfairness to the indemnitor. *Parfait, supra* at 305.

The Court concludes that the circumstances surrounding the settlement not only suggest unfairness to United General, but permeate the entire structure of the present litigation with procedural infirmity which further suggests a collusive motive.[3]

Perhaps inspired by a rapidly approaching trial date, the plaintiffs and Oilfield Marine sought to mutually gain much more than they were able to give via settlement. With the magnanimous gesture of releasing Oilfield Marine from the threat of bankruptcy, plaintiffs surrendered the potentially worthless judgment. In exchange, Oilfield Marine "only" promised to obligate and pursue United General, not yet a party to the litigation, for exclusive payment of 80 percent of the claim. Having been advised that United General had recently denied coverage, the plaintiffs sought to avoid those problems inherent in proving actual fault at trial. In the process, plaintiffs side-stepped the Louisiana Direct Action Statute, La.Rev.Stat. 22:655, which prohibits direct action against insurers on contractual claims. *Taylor v. Fishing Tools, Inc.,* 274 F.Supp. 666 (E.D.La.1967). While this matter could perhaps be disposed of on this ground alone, the Court feels that to do so would not only involve ploughing new territory, but leave open the possibility of future difficulties, even in this same case.

Turning to the merits, the Court seriously doubts that Oilfield Marine is left with a genuine interest in this litigation as the result of the settlement; in practical terms, they have nothing to gain and nothing to lose in their present posture. See: *Fenner v. Continental Diving Service, Inc.,* 543 F.2d 1113 (5th Cir.1976).[4] Simply put, it is inconceivable to this Court how Oilfield Marine's self-interest in being totally released from

**2.** These assumptions are made relative to the Court's analysis of liability for settlement monies only and do not affect the issue of attorney's fees and costs for wrongful denial of coverage, discussed *infra.*

**3.** In this regard, the Court does not believe that Tidex, an operator, can validly exert claims for vessel loss or search and location expenses. For purposes of this analysis, however, the Court will assume that Tidex is properly before it.

**4.** Since the settlement was conditioned on Oilfield Marine's promise to "pursue", this Court considers this factor as indicative of the basic inequities involved in the settlement rather than as undermining the Court's jurisdiction over this matter.

924

exposure in this suit in exchange for a promise to "pursue" constitutes adequate restraint against the possible imprudent and extravagant spending of its indemnitor's money. And yet there are no other barriers in sight.

Viewed in light of these motivational circumstances, and inequities, as well as the Court's perception of the operative facts surrounding the actual casualty, the Court concludes that the settlement was not entered into in good faith or at arm's length and is not reasonable. Accordingly, United General is not obligated to pay monies thereunder.

Having previously concluded that coverage is not afforded under the relevant United General policy and endorsement, Oilfield Marine is not entitled to recovery of attorneys' fees, expenses or costs. Accordingly,

IT IS ORDERED that judgment will be entered in favor of defendant and cross-claimant, United General Insurance Company, and against plaintiffs TMS Acquisition Corporation and Tidex, Inc. and defendants and cross-claimants A.L. Commercial Fabricating and Blasting Corporation and Oilfield Marine, Inc. United General's third-party claim against Pental Insurance Co., Ltd. is dismissed. Each party is to bear its own costs.