450 F.2d 580
 Porphire LANASSE, Plaintiff-Appellee,
v.
TRAVELERS INSURANCE COMPANY et al., Defendants-Appellees.
The CALIFORNIA COMPANY, Defendant-Third Party Plaintiff-Appellant,
v.
ROYAL INSURANCE COMPANY, EXCESS-SURPLUS LINES, INC., and/or
Underwriters at Lloyd's, London, et al., Third
Party Defendants-Appellees.
 No. 31130 Summary Calendar.*
 United States Court of Appeals,
Fifth Circuit.
 Oct. 19, 1971.
Rehearing and Rehearing En Banc Denied Jan. 12, 1972.
 
 Lloyd C. Melancon, New Orleans, La., for Chevron Oil Co., The California Co. Div.; McLoughlin, Barranger, Provosty & Melancon, New Orleans, La., of counsel.
 Kenneth W. Manuel, George A. Frilot, E. Jack Green, Jr., Lemle, Kelleher, Kohlmeyer, Matthews & Schumacher, New Orleans, La., for Royal Ins. Co., Excess-Surplus Lines, Inc., Underwriters at Lloyd's, London, Minor Cheramie and Cheramie Bo-Truc No. 5, Inc.
 Before JOHN R. BROWN, Chief Judge, and INGRAHAM and RONEY, Circuit Judges.
 JOHN R. BROWN, Chief Judge:
 
 
 1
 This is another one of those seagoing donnybrooks in which all generously claim that someone else must bear the burden of amounts paid to a seaman for injuries sustained during a typical offshore drilling operation in Louisiana shelf waters. Aside from the usual complexities arising from impleaders, cross-claims, direct actions against underwriters and demands for indemnity, it is also a case in which the party that wrote the contract claims it does not mean what it says and means what it does not say.
 
 
 2
 The now-to-be-forgotten victim (Porphire Lanasse) was a crew member on the utility tender Bo-Truc No. 5,[1] then under time charter to Chevron.[2] By stipulation Cheramie settled the claim brought by Lanasse as a full-fledged bluewater seaman against Cheramie and on diversity against Chevron. The case as submitted to the District Court, lacking only an ailing plaintiff, was for the determination of who should bear any, all or part of the loss.[3]
 
 
 3
 The District Court was unpersuaded by Chevron's arguments on both the indemnity contract and the P & I policy and entered judgment against Chevron for the full amount paid by Cheramie in settlement of the claim for maintenance and cure and damages asserted by Lanasse.
 
 What Happened to Lanasse
 
 4
 As usual, all but forgotten is the event which brings all this about, certainly as to Lanasse's problems. Cf. United Services Automobile Association v. Russom, 5 Cir., 1957, 241 F.2d 296.
 
 
 5
 On April 25, 1964 M/V Bo-Truc No. 5 was operating in the Gulf of Mexico under a written time charter between Cheramie and Chevron.[4] Chevron ordered the vessel to proceed to its fixed off-shore production platform "Zulu" for the purpose of moving a welding machine from the west to the east side of the structure. The weather was clear, Bo-Truc No. 5 was heavily ballasted and riding well on the water, there was only a little wind and a few small swells, and the only cargo on deck consisted of three mud pallets which had been stacked 10 to 12 feet behind the wheelhouse[5] in order to make room for the welder.
 
 
 6
 After transferring a supply of potable water to the platform, the vessel proceeded to the west side of the rig where without incident Chevron's crane operator, Plaisance, lowered the welding machine onto the afterdeck of Bo-Truc No. 5. While the machine was being secured and Bo-Truc No. 5 moved to the other side of the platform, Plaisance crossed to the east side, positioned himself at the controls of the crane located there, and proceeded to lower the line and hook. His view of the waiting vessel was clear and unobstructed.
 
 
 7
 When the hook had been lowered it was caught by a deckhand and handed to Lanasse, who proceeded to attach it to an eye on top of the welding machine. Although there is conflicting testimony as to what followed, the District Court found-and Chevron does not seriously challenge these findings-that after the hook was secured but before either man had moved clear, the crane operator began lifting but stopped when the machine was 5 or 6 inches above the deck, causing the load to swing against the starboard railing of the vessel and then back into Lanasse. Plaisance then lowered the machine back onto the deck, and in attempting to get out of the way Lanasse was knocked back and pinned against the pallets. Only his great size and physical strength prevented him from being crushed to death.
 
 
 8
 The District Court also found that (i) the sole proximate cause of the injury was the negligence of Chevron's crane operator, (ii) the vessel was not unseaworthy and (iii) no member of the vessel's crew was guilty of negligence. While Chevron half-heartedly challenges these findings, we think they are amply supported by evidence in the record that rises way above the Plimsoll line of F.R.Civ.P. 52(b). They are not clearly erroneous, and we accept them.
 
 
 9
 How to Escape from Crane Operator's Negligence
 
 
 10
 Essentially Chevron's main argument is that even though the mishap was solely the result of its own negligence, any resulting liability fell on Cheramie under the indemnity provision in the time charter (note 4, supra.). In addition, Chevron claims its liability was also covered under the terms of a standard P & I policy[6] obtained by Cheramie in accordance with the terms of the charter. The policy incorporated the typical provision insuring liabilities of the assured as shipowner.[7] Coverage was expressly extended to Chevron as an additional assured and, even more significantly, the underwriters' right of subrogation against Chevron was expressly waived.[8]
 
 The Indemnity Covenant Too Loose
 
 11
 The indemnity provision in the time charter insulated Chevron only against liability for claims "directly or indirectly connected with the possession, management, navigation, and operation" of the vessel. Cheramie does not have a legal responsibility for the consequences of the negligent operation of the crane-the proximate cause of the injury-because, on the facts found, the operation of the crane was not even remotely related to the operation, navigation or management of the vessel. As broad as those terms are to comprehend injuries caused by the operation of the vessel in a practical sense, they do not comprehend an occurrence in which the vessel's sole contribution is to be there as the carrier from which the cargo is being removed.
 
 
 12
 Even, however, if we were to stretch the limits of the English language to find that somehow the crane operator was "indirectly" engaged in the "operation" of Bo-Truc No. 5, or vice versa, we still could not read the charter clause to blanket Chevron with the claimed immunity against liability for the negligence of its own employees. As we stated in Batson-Cook Co. v. Industrial Steel Erectors, 5 Cir. 1958, 257 F.2d 410, 413, "the purpose to impose this extraordinary liability * * * must be spelled out in unmistakable terms. It cannot come from reading into the general words used the fullest meaning which lexicography would permit." Liability of this sort can arise only from the plainly expressed intention of the parties, manifested by language couched in unmistakable terms,[9] not from a mere after-the-fact judicial inference based solely upon what Chevron claims it intended to say but did not.[10] The lack of concreteness and specificity cannot be cured at this late date by the unilateral contention of one party that it meant to impose unlimited liability on the other side.
 
 P & I Policy Does Not Cover
 
 13
 The Trial Judge was also right in holding that the P & I policy did not cover this claim because Chevron as an additional assured (see note 6, supra) did not become liable "as owner of" the vessel. The fact findings-which no one can, or does, challenge-are specific. The vessel and her crew were, on the one hand, absolved from all wrong or unseaworthiness. Chevron, on the other hand, was found at fault for the manner in which the crane was operated. The vessel offered nothing further than a condition or locale for the accident.
 
 
 14
 There must be at least some causal operational relation between the vessel and the resulting injury. The line may be a wavy one between coverage and noncoverage, especially with industrial complications in these ambiguous amphibious operations plus those arising from the personification of the vessel as an actor in a suit in rem. But where injury is done through nonvessel operations, the vessel must be more than the inert locale of the injury.[11] Nothing more occurred here, for it was Chevron's actions as a platform operator or as a crane operator that caused the harm, and that does not make it a liability of a shipowner.[12]
 
 
 15
 Thus far we speak with a single voice and conclude that the Trial Court was correct, with the result that the judgment is affirmed.
 
 
 16
 P & I Underwriter Pursues Its Assured*
 
 
 17
 Although the parties have not pressed it here as such, a serious question arises on the face of the policy. We should notice it under the broad reservations of issues to be adjudicated in subparagraph (4) (c) of the stipulation (see Note 3, supra).
 
 
 18
 Chevron is, without a doubt, an additional assured. True, it cannot claim the affirmative benefit of the coverage, since the liability imposed was not that of a shipowner. But the claim as tried is not primarily for affirmative recovery.[13] It is a claim by Cheramie and presumably its underwriters for recoupment of the sums paid to Lanasse, the injured seaman. If, as is likely, the defense of Cheramie was by the P & I underwriters and payment of the settlement was in effect made by them, then clearly the underwriter could not in its own name (or in the more appealing name of its assured) recover against Chevron in the face of the explicit policy provision waiving subrogation. Great American Ins. Co. of New York v. Gulf Marine Drilling No. 1, 5 Cir., 1962, 302 F.2d 332; Insurance Company of North America v. Elgin, Joliet & Eastern Railway Co., 7 Cir., 1956, 229 F.2d 705. Indeed, the usual rule independent of a contractual provision is that an underwriter cannot recover by way of subrogation against its own assured. Builders & Mfrs. Mut. Casualty Co. v. Preferred Automobile Ins. Co., 6 Cir., 1941, 118 F.2d 118; New Amsterdam Casualty Co. v. Homans-Kohler, Inc., D.C.R.I., 1970, 310 F.Supp. 374, 376 and cases cited therein. It is all the more applicable when the contract is as specific as it is here.
 
 
 19
 However, since the issue was not raised in the trial court, I think that we should remand for a determination of whether this protection was waived by Chevron or otherwise foreclosed by a settlement obviously worked out in a practical way by knowledgeable former proctors.[14] If it was, then the whole judgment ought to be affirmed. If not, the holdings on the indemnity clause and affirmative coverage under the P & I policy should stand affirmed, with such disposition thereafter as might be appropriate.
 
 
 20
 Affirmed.
 
 
 21
 ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC
 
 PER CURIAM:
 
 22
 The Petition for Rehearing is denied and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is denied.
 
 
 
 *
 Rule 18, 5 Cir.; see Isbell Enterprises, Inc. v. Citizens Casualty Co. of New York et al., 5 Cir., 1970, 431 F.2d 409
 
 
 [1]
 Owned by Cheramie Bo-Truc No. 5, Inc
 
 
 [2]
 Chevron Oil Company (The California Company Division) was the charterer of Bo-Truc No. 5 and the operator of the offshore platform "Zulu."
 
 
 [3]
 The stipulation provided:
 "(4) This litigation shall proceed to trial, without a jury, in order that the Court might determine the following:
 (a) The liability to the plaintiff, if any, on the part of Cheramie Bo-Truc No. 5, Inc., and/or Chevron Oil Company The California Company Division;
 (b) The validity of the indemnity claims asserted by and between Cheramie Bo-Truc No. No. 5, Inc. and Chevron Oil Company The California Company Division;
 (c) The applicability of the insurance afforded Chevron Oil Company The California Company Division under the policy of insurance covering the vessel Bo-Truc No. 5."
 
 
 [4]
 The relevant terms of the time charter are as follows:
 "Owner hereby warrants that the said vessel is now, and at all times during the life of this charter will be, maintained by owner at owner's expense properly staunch, strong, and in all respects seaworthy, and in good repair and running condition. * * * Owner shall man, operate, and navigate the vessel. * * * Responsibility for the management and navigation and operation of the vessel shall remain at all times in the owner. * * * Owner hereby agrees to indemnify and hold harmless The California Company against all claims * * * as well as against any and all claims for damages, whether to person or property, and howsoever arising in any way directly or indirectly connected with the possession, navigation, management, and operation of the vessel. During the life of this charter, owner will, at its own expense, provide and maintain insurance covering all liabilities which might arise from the possession, management, manning, navigation, and operation of the vessel, which said policies shall be in form and amount, and with companies as required and approved by The California Company; and on which policies The California Company shall, if it so elects, be included as party assured." (Emphasis added)
 Needless to say, this standard-form scenario was written, produced and directed by Chevron on a printed form of charter.
 
 
 [5]
 The District Court's findings establish that the pallets were not in a position to interfere with the operations
 
 
 [6]
 See Continental Oil Co. v. London Steam Ship Owners' Mut. Ins. Assn., 5 Cir., 1969, 417 F.2d 1030, 1969 A.M.C. 1882, cert. denied, 397 U.S. 911, 90 S.Ct. 911, 25 L.Ed.2d 92
 
 
 [7]
 The policy was written by appellees Royal Insurance Company, Excess-Surplus Lines, Inc., and Lloyd's of London
 It provided:
 "In consideration of the premium and subject to the warranties, terms and conditions herein mentioned, this Company hereby undertakes to pay up to the amount hereby insured and in conformity with lines 5 and 6 hereof, such sums as the assured, as owner of the Vessels as per Schedule shall have become legally liable to pay and shall have paid * * *." (Emphasis added)
 It also contained the traditional provision:
 "It is expressly understood and agreed if and when the assured has any interest other than as a shipowner in the vessel named herein, in no event shall this Company be liable hereunder to any greater extent than if the assured were the sole owner and entitled to petition for limitation of liability in accordance with present and future law."
 Only an owner or owner pro hac vice can limit liability. See 46 U.S.C.A. Sec. 181 et seq.
 
 
 [8]
 "While the vessel(s) named herein is/are working for any of the following [Chevron] the one for whom the vessel(s) is/are working at any given time is named as an additional assured during that particular time and all rights of subrogation hereunder are waived with respect to the one for whom the vessel(s) is/are working at that particular time."
 
 
 [9]
 Transcontinental Gas Pipe Line Corp. v. Mobile Drilling Barge Mr. Charlie, 5 Cir., 1970, 424 F.2d 684, 692, cert. denied, Ocean Drilling & Exploration Co. v. Signal Oil & Gas Co., 1971, 400 U.S. 832, 91 S.Ct. 65, 27 L.Ed.2d 64; Grigsby v. Coastal Marine Service of Texas, Inc., 5 Cir., 1969, 412 F.2d 1011, 1039, cert. dismissed, Fidelity and Casualty Co. v. Grigsby, 1970, 396 U.S. 1033, 90 S.Ct. 612, 24 L.Ed.2d 531; Standard Oil of Texas v. Wampler, 5 Cir., 1955, 218 F.2d 768, 770; United States v. Seckinger, 5 Cir., 1969, 408 F.2d 146, 150-151, rev'd on other grounds, 1970, 397 U.S. 203, 90 S.Ct. 880, 25 L.Ed.2d 224
 
 
 [10]
 As pointed out in Seckinger, supra, 408 F.2d at 150, 151, our decisions in Jacksonville Terminal Co. v. Railway Express Agency, Inc., 5 Cir., 1961, 296 F.2d 256, cert. denied, 369 U.S. 860, 82 S.Ct. 949, 8 L.Ed.2d 18 and American Agricultural Chemical Co. v. Tampa Armature Works, Inc., 5 Cir., 1963, 315 F.2d 856, both of which upheld indemnity, were pronouncements by us of Erie-Florida law and were subsequently repudiated by the Florida courts
 
 
 [11]
 Unique problems arise in hull, P & I and towers liability situations. See, e. g., United States Fire Insurance Co. v. Gulf States Marine & Mining Co., 5 Cir., 1959, 262 F.2d 565, 1959 A.M.C. 397; Conners Marine Co. v. Northwestern Fire & Marine Ins. Co., S.D.N.Y., 1936, 16 F.Supp. 626, 1936 A.M.C. 1061, aff'd, 2 Cir., 1937, 88 F.2d 637, 1937 A.M.C. 344. Likewise, policy integration problems arise as between P & I and land based general liability insurance. See, e. g., Employers Mutual Liability Ins. Co. of Wisconsin v. Aetna Ins. Co., E.D.Mich., 1966, 254 F.Supp. 263, 1966 A.M.C. -
 
 
 [12]
 In the Matter of Barge BW 1933 Fire, 1968 A.M.C. 2738 (Arb.). The arbiter, an experienced maritime lawyer of note, wrote an opinion of credit to a Judge-elected, life tenured or Solomonic. Since judicial materials on marine insurance are scarce in America, and there are no Elder Brethren of Trinity House, the business world and Courts must depend heavily upon the usage of adjusters, brokers and underwriters, and most certainly upon the reported, considered arbitration awards of experienced maritime practitioners
 
 
 *
 The following section represents the views of the Chief Judge only
 
 
 [13]
 Of course, Chevron did file impleaders and cross-claims against Cheramie and its underwriters
 
 
 [14]
 Much suggests this likelihood, and if so not much was "waived." Someone had to advance the settlement funds. The real contest was over whether it was a P & I responsibility or that of Chevron's other liability insurers. See note 3, supra. Had Chevron (or its liability insurers) advanced the funds, it is clear that neither Cheramie nor its P & I underwriters would be liable for reimbursement. Had it declined to make the advance, this could have led to an impasse forcing the case to trial vis-a-vis Lanasse, Chevron and Cheramie. In that event, Chevron would have been the loser