688 F.2d 973
 David R. TARLTON, Plaintiff-Appellant,
v.
EXXON, Defendant and Third-Party Plaintiff-Appellee,
DIAMOND M DRILLING, Defendant and Third-Party
Plaintiff-Appellant-Appellee,
v.
GOLDEN MEADOWS ENTERPRISES, INC., and Eserman Offshore
Services, Third-Party Defendants-Appellants,
v.
COASTAL BOAT OPERATORS, Third-Party Defendants-Appellees.
 No. 80-3478.
 United States Court of Appeals,
Fifth Circuit.
 Sept. 27, 1982.
 
 Randolph J. Waits, AndrEe J. Mouledoux, New Orleans, La., for Golden Meadows Enterprises and Eserman Offshore Services.
 Lawrence D. Wiedemann, Stanley J. Jacobs, New Orleans, La., for Tarlton.
 Philip E. Henderson, Houma, La., for Diamond M. Drilling.
 E. Burt Harris, Rene J. Mouledoux, William B. Matthews, Jr., New Orleans, La., for Exxon.
 A. Wendel Stout, III, Christopher Tompkins, New Orleans, La., for Coastal Boat Operators.
 Appeals from the United States District Court for the Eastern District of Louisiana.
 Before POLITZ and RANDALL, Circuit Judges*.
 POLITZ, Circuit Judge:
 
 
 1
 David Tarlton was injured while serving as the captain of the M/V BECT I, a vessel owned by Eserman Offshore Services, chartered to Exxon and operated by Golden Meadows Enterprises, Inc. The BECT I was used to service offshore platforms. On the day of Tarlton's accident, it delivered food supplies to an Exxon platform, on which Diamond M Drilling Company conducted drilling operations.
 
 
 2
 After the food box was off-loaded, a Diamond M employee asked Tarlton to transport the empty food box, a few passengers, and "some other small things" to shore. Tarlton agreed. At the time, seas were running six to eight feet. Notwithstanding the substantial seas, the platform crane operator, an employee of Diamond M, loaded tubular drill collars onto the deck of the BECT I. Tarlton was not aware the "small things" were drill collars until after they were placed aboard. It was imperative that the drill collars, which were rolling about the deck, be secured. While attempting to do so, Tarlton was injured. During this unfortunate scenario, late in the evening, Exxon's platform representative was not on the platform deck; he was asleep.
 
 
 3
 Tarlton initially filed a seaman's complaint against Diamond M and Exxon, later amending to add Eserman, Golden Meadows and Coastal Boat Operators (the company which brokered the BECT I to Exxon) as additional defendants. Tarlton also alleged the unseaworthiness of the BECT I and sought maintenance and cure in his claim.
 
 
 4
 Eserman and Golden Meadows cross-claimed against Exxon and Diamond M for reimbursement of sums paid Tarlton for maintenance and cure, sums in fact paid by American Home Assurance Company. Exxon cross-claimed against Golden Meadows, Coastal, and Eserman for indemnification and attorneys' fees pursuant to contracts extant between them. Coastal cross-claimed against Golden Meadows and Eserman for attorneys' fees and costs. As the parties went to trial, Exxon and Diamond M agreed that Exxon would indemnify Diamond M if "a final judgment, after completion of all post-trial motions, appeals, etc. is entered, finding that the plaintiff's alleged injuries were proximately caused by the joint negligence of Diamond and Exxon."[1]
 
 
 5
 The case was tried to a jury, which returned a special verdict finding Diamond M and Exxon liable to Tarlton, with fault percentages of 95% and 5%, respectively. Coastal, Eserman, and Golden Meadows were found free of fault and the BECT I was found seaworthy. The jury awarded Tarlton $450,000 in damages and fixed "10-11-79" as the date when maximum cure was reached, thus setting the basis for the maintenance and cure award.
 
 
 6
 Ruling on the various cross-claims, the district court rejected Eserman's and Golden Meadows' demand for reimbursement of maintenance and cure payments from Exxon and Diamond M, finding that American Home Assurance Company had paid these sums and had specifically waived its subrogation rights.[2] The court granted Exxon's claim against Golden Meadows and Eserman for attorneys' fees and costs and granted Coastal's claim against Golden Meadows and Eserman for attorneys' fees and costs.
 
 
 7
 Exxon moved for judgment notwithstanding the verdict and sought a remittitur. The trial judge granted Exxon's motion for judgment n.o.v. Additionally, on its own motion, the trial judge modified the judgment against Diamond M by ordering "that a new trial on the issue of damages be held unless plaintiff remits $75,000.00 of the jury award."
 
 
 8
 Four issues are posited for appellate review: (1) whether the trial court erred in granting Exxon's motion for judgment n.o.v.; (2) whether the trial court erred in granting a motion for a new trial on the amount of damages conditional on the plaintiff's acceptance of a $75,000 remittitur in light of Rule 59(d) of the Federal Rules of Civil Procedure; (3) whether error was committed in awarding Exxon and Coastal costs and attorneys' fees against Golden Meadows and Eserman; and (4) whether the trial judge erred in instructing the jury to consider inflation as a factor in assessing Tarlton's award. Our review of the record compels the conclusion that the district court erred in entering the remittitur order and in granting Exxon's and Coastal's claims for costs and attorneys' fees against Golden Meadows and Eserman. Accordingly, we affirm in part, vacate in part, and reverse in part.
 
 Judgment Notwithstanding the Verdict
 
 9
 The oft-cited decision in Boeing Co. v. Shipman, 411 F.2d 365 (5th Cir. 1969) (en banc) articulates the rubric in this circuit for the grant or denial of a judgment n.o.v. In essence, a mere scintilla of evidence is not sufficient to sustain a jury determination; "(t)here must be a conflict in substantial evidence to create a jury question." Id. at 375. See, e.g., Hagans v. Oliver Machinery Co., 576 F.2d 97 (5th Cir. 1978). In the process of evaluating the motion, the district court is obliged to review the evidence in the light most favorable to the jury's verdict. This was done in the case at bar. Having walked the same path as the trial judge, we reach the same conclusion.
 
 
 10
 The record reflects that while the Exxon representative was on the platform at the time of the accident he was asleep. He was not aware of the unloading of the grocery box, that Tarlton had been requested to return with the emptied box, or that Tarlton had been asked to transport passengers and other small items. Nor was he alerted to the fact that the Diamond M crane operator might surreptitiously place the drill collars on the deck of the vessel without first consulting Captain Tarlton. The Exxon representative did not order the loading of the drill collars; he did not authorize the loading; and he was in no way forewarned. The only basis suggested for saddling Exxon with negligence is that it sanctioned the type of conduct that occurred the night of the accident, i.e., loading in rough seas.
 
 
 11
 Diamond M maintains that Exxon representatives previously had condoned loading vessels in six to eight foot seas, a practice cited as negligent.[3] Although this proposition bears some surface appeal, it fades upon closer examination. As we held in Hebron v. Union Oil Co. of Calif., 634 F.2d 245 (5th Cir. 1981), a platform owner is not negligent for dispatching a supply vessel in six to eight foot seas, seas admittedly rough but not necessarily dangerous for loading or unloading. Such activity is not at all unusual at the myriad offshore platforms in the gulf.
 
 
 12
 Our review of the testimony convinces us beyond peradventure that the cause of the accident was the decision by the Diamond M crane operator to "sneak" the drill collars on board the BECT I. The crane operator admitted he had to act stealthily because he believed Captain Tarlton would not have allowed him to load the tubular drill collars on the vessel. In view of this testimony and the other evidence, we are in total agreement with the district judge that "(i)t was the decision to load the drill collars onto plaintiff's vessel which was the negligence which caused plaintiff's injury." The judgment n.o.v. was properly granted.
 
 Remittitur
 
 13
 Tarlton challenges the remittitur on two grounds. We discern no merit in the first contention that the granting of a new trial, to be avoided only by acceptance of the remittitur, was an unconstitutional act, violative of the seventh amendment. To the contrary, it is now firmly established that the remittitur practice is not in conflict with the seventh amendment. See, e.g., Lowe v. General Motors Corp., 624 F.2d 1373 (5th Cir. 1980); Shore v. Parklane Hosiery Co., Inc., 565 F.2d 815 (2d Cir. 1977), aff'd, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979); Bonura v. Sea Land Serv., Inc., 505 F.2d 665 (5th Cir. 1974); Gorsalitz v. Olin Mathieson Chem. Corp., 429 F.2d 1033 (5th Cir. 1970). See also Dimick v. Scheidt, 293 U.S. 474, 55 S.Ct. 296, 79 L.Ed. 603 (1935).
 
 
 14
 Tarlton's second attack on the remittitur presents a serious issue, having at its core the question of the proper application of Rule 59(d) of the Federal Rules of Civil Procedure which prescribes:
 
 
 15
 Not later than 10 days after entry of judgment the court of its own initiative may order a new trial for any reason for which it might have granted a new trial on motion of a party. After giving the parties notice and an opportunity to be heard on the matter, the court may grant a motion for a new trial, timely served, for a reason not stated in the motion. In either case, the court shall specify in the order the grounds therefor.
 
 
 16
 On March 21, 1980, the jury returned a verdict in favor of Tarlton against Diamond M and Exxon in the amount of $450,000. The jury found Diamond M 95% at fault and Exxon 5% at fault. Demands against all other defendants were rejected.
 
 
 17
 Based on this verdict, the district judge entered judgment on the main demand on March 27, 1980, casting Diamond M for $427,500 and Exxon for $22,500. Within 10 days, on April 7, 1980, Exxon moved for a judgment n.o.v., a new trial, or in the alternative, a remittitur. A hearing on Exxon's motions was held on May 14, 1980, and the motions were taken under advisement. Although initially opposed, Diamond M sought at this hearing to orally join in Exxon's motions. On June 3, 1980, the trial court granted Exxon's request for judgment non obstante veredicto and dismissed Tarlton's claim against it. Acting sua sponte, the court simultaneously ordered a new trial on the issue of damages "unless plaintiff remits $75,000.00 of the jury award."
 
 
 18
 We must determine whether this order was timely. Concluding that it was not, we vacate the order for a new trial on the issue of damages and reinstate the judgment based on the jury verdict, modified to delete the adjustment attributable to the jury's finding of Exxon's 5% negligence, thus casting Diamond M for the full amount of damages awarded by the jury.
 
 
 19
 The time limit for filing a new trial motion imposed in Rule 59(b) is mandatory and jurisdictional; it cannot be extended by the trial court. Gribble v. Harris, 625 F.2d 1173 (5th Cir. 1980); Albers v. Gant, 435 F.2d 146 (5th Cir. 1970). Diamond M's oral motion on May 14, 1980 was not timely and is, accordingly, without effect.[4] The trial court's grant of a new trial can thus be upheld only if it satisfies the provision of Rule 59(d) for sua sponte judicial action within 10 days of the entry of judgment.
 
 
 20
 Prior to its 1966 amendment, Rule 59(d) was interpreted to preclude a trial court from granting a new trial on a ground not stated in a motion filed seasonably, i.e., within 10 days of the entry of judgment. See, e.g., Russell v. Monongahela R.R. Co., 262 F.2d 349 (2d Cir. 1958); Freid v. McGrath, 76 U.S.App.D.C. 388, 133 F.2d 350 (1942); Marshall's U.S. Auto Supply, Inc. v. Cashman, 111 F.2d 140 (10th Cir.), cert. denied, 311 U.S. 667, 61 S.Ct. 26, 85 L.Ed. 428 (1940). According to the Notes of the Advisory Committee on Rules, this situation was "undesirable." The Committee noted that "(j)ust as the court has power under Rule 59(d) to grant a new trial of its own initiative within the 10 days, so it should have the power, when an effective new trial motion has been made and pending, to decide it on the grounds thought meritorious by the court although not advanced in the motion." The second sentence of Rule 59(d) was added in 1966 to afford the trial court this authority. But the expansion of the trial court's power to order a new trial for reasons not raised by the mover does not operate to extend the period in which the court can grant a new trial on its own initiative.
 
 
 21
 The language of Rule 59(d) is explicit: the trial court may order a new trial for any reason it might have found sufficient on motion of a party, "not later than 10 days after entry of judgment." In the case at bar, the district court's order of June 3 was obviously filed more than 10 days after the March 27 judgment. And it granted relief to Diamond M on the basis of a reason urged by Exxon in its timely filed motion, originally opposed by Diamond M. We conclude that absent a timely motion by Diamond M for a new trial, or an order by the trial judge within the 10 days permitted by the rule, the trial court was without jurisdiction to enter a sua sponte order for a new trial.[5]
 
 
 22
 Apparently in recognition of this jurisdictional limit, Diamond M contends that "judgment" as used in Rule 59(d) should be read "final judgment" or "appealable judgment." Diamond M suggests that because the Exxon motion extended the time for the filing of a notice of appeal, Fed. R. App. P. 4(a) (4), it should likewise extend the time for entry of a sua sponte order of new trial under Rule 59(d). We disagree. The purpose served by the two rules differ.
 
 
 23
 Appellate Rule 4(a)(4) looks to the next level of court and is designed in part to keep the trial court action intact, in one appealable unit, until the entire litigation is completed in the trial court by disposition of all post-trial motions. At that point, all parties have the same time in which to notice an appeal.
 
 
 24
 Rule 59(d) is designed to empower the trial judge to correct an injustice occasioned, primarily, by a jury verdict. The error in the verdict should be, except in the rarest of cases, apparent immediately upon return of the verdict. In those instances, the court may act, but it must exercise its authority with dispatch, within the limited period established by the rule. Just as the court may not extend the period for a party to file a motion for a new trial, it may not extend the period for a court-initiated action.
 
 
 25
 To accept Diamond M's argument and extend the time for the trial court to act under 59(d) until the judgment becomes appealable would require a rewriting of the rule. This we decline to do. Nothing in the language or history of Rule 59(d) suggests that the 10-day period is intended to signify anything other than 10 days from entry of judgment. There is no suggestion that the period may be extended, directly or indirectly. No parallel may be drawn to Fed. R. App. P. 4 which expressly provides that the time for appeal is suspended by the filing of a timely post-trial motion, running only after the court's ruling thereon. Acceptance of Diamond M's argument would allow the time prescribed by Rule 59(d) to be extended indefinitely for all defendants simply because one defendant timely sought post-trial relief. That could result in the anomalous situation of the court, months after the verdict, denying a timely filed motion of one defendant, and sua sponte, granting relief to a defendant who sought no relief.
 
 
 26
 We conclude that the trial court was without jurisdiction to grant Diamond M a new trial, a conclusion which requires that we vacate the new trial ordered on the issue of damages.
 
 Costs and Attorneys' Fees
 
 27
 Eserman and Golden Meadows contend that the trial court erred in imposing upon them Exxon's and Coastal's costs of defense and attorneys' fees. Resolution of this issue turns upon interpretation of contractual indemnity agreements between these parties. Our reading of the contractual language in light of LaNasse v. Travelers Ins. Co., 450 F.2d 580 (5th Cir. 1971), convinces us that the district court's award of costs and attorneys' fees was improper.
 
 
 28
 Eserman's bareboat charter agreement with Candies Offshore Transportation Corp., for the service of the BECT I, contemplated Candies brokering the vessel to Exxon. Infusing the names of the parties into the text of the contract, paragraph X of the charter agreement reads:
 
 
 29
 (Eserman) agrees to indemnify and hold (Coastal) and (Exxon) harmless ... from any claims or suits resulting from injury or damage to ... third persons ... arising out of the operation of the vessel under this charter, unless caused by the sole negligence of (Candies) ....
 
 
 30
 (Emphasis added.) And restructuring paragraph XIV of the service agreement for operation of the vessel, between Coastal and Golden Meadows, results in the following:
 
 
 31
 (Golden Meadows) binds and obligates itself to indemnify and save (Exxon), (Coastal) and (Candies) harmless from and against any and all claim or claims or causes of action asserted by employees of (Golden Meadows) ... resulting from the operation of (the BECT I) and/or the acts or omissions of the captain or crew of (the BECT I) while performing or attempting to perform the services herein contemplated and whether or not arising out of the joint and concurrent acts or omissions of (Exxon), Coastal ... and Candies ....
 
 
 32
 (Emphasis added.)
 
 
 33
 As we have underscored, the operative language in both agreements focuses upon services or operations of the vessel. In LaNasse we considered the effect of a similar provision, which stated:
 
 
 34
 Owner (Cheramie BoTruc No. 5) hereby agrees to indemnify and hold harmless The California Company against all claims * * * as well as against any and all claims for damages, whether to person or property, and however arising in any way directly or indirectly connected with the possession, navigation, management, and operation of the vessel.
 
 
 35
 450 F.2d at 582 n. 4 (emphasis in original). Porphire LaNasse had been injured in the course of his duties as a crew member aboard the utility tender BO-TRUC NO. 5, while assisting in the transfer of a welding unit from a vessel to a platform. The crane operator, employed by Chevron Oil Company, caused the load to swing against the tender's railing and into LaNasse. Accepting the district court's conclusion that the proximate cause of LaNasse's injury was the negligence of Chevron's crane operator, we proceeded to declare the indemnity agreement inapplicable:
 
 
 36
 The indemnity provision in the time charter insulated Chevron only against liability for claims "directly or indirectly connected with the possession, management, navigation, and operation" of the vessel. Cheramie does not have a legal responsibility for the consequences of the negligent operation of the crane-the proximate cause of the injury-because, on the facts found, the operation of the crane was not even remotely related to the operation, navigation or management of the vessel. As broad as those terms are to comprehend injuries caused by the operation of the vessel in a practical sense, they do not comprehend an occurrence in which the vessel's sole contribution is to be there as the carrier from which the cargo is being removed.
 
 
 37
 Id. at 583.
 
 
 38
 The circumstances involved in the instant case are similar to the situation addressed in LaNasse. At the time of Tarlton's injury, he was attempting to secure tubular drill collars that had been loaded onto the BECT I surreptitiously and negligently. It was the negligence of Diamond M's crane operator that caused Tarlton's injury. The accident simply was not caused by the operation of the vessel; nor did it arise from the expected performance of its services.[6] Although the indemnification agreements in dispute in this case are not identical to the contractual provision construed in LaNasse, we are not persuaded that the variances are significant enough to command a different result. We conclude that the LaNasse rationale applies. Since the cause of Tarlton's injury did not arise from the operation of the vessel, the district court should not have awarded Exxon and Coastal costs and attorneys' fees against Eserman and Golden Meadows. That portion of the trial court's judgment is reversed.
 
 The Inflation Factor
 
 39
 A final issue raised for our consideration is whether the trial court erred by instructing the jury that the present rate of inflation may be considered in assessing the plaintiff's award. For the reasons extensively set forth in our recent en banc decisions in Byrd v. Reederei, 688 F.2d 324 (5th Cir. 1982), and Culver v. Slater Boat Co., 688 F.2d 288 (5th Cir. 1982), this portion of the court's charge was not erroneously given. Accordingly, there is no validity in this allegation of error.
 
 
 40
 For the reasons assigned, the judgments of the district court are AFFIRMED in part, VACATED in part, and REVERSED in part.
 
 
 
 *
 Jack M. Gordon, District Judge of the Eastern District of Louisiana, sitting by designation, was a member of the panel which heard oral argument. Because of his death, this case is being decided by a quorum, 28 U.S.C. § 46(d)
 
 
 [1]
 When Tarlton sued Diamond M, it brought a cross-claim against Exxon, calling for Exxon to defend, indemnify, and hold it harmless pursuant to their contract. Initially, Exxon accepted the demand and assumed Diamond M's defense. Subsequently, Exxon informed Diamond M that it would no longer defend it. Thereafter, the quoted stipulation was agreed to
 
 
 [2]
 By an order dated May 14, 1980, the district court amended its earlier ruling and awarded Golden Meadows $500.00 on its cross-claim against Diamond M for reimbursement of maintenance and cure
 
 
 [3]
 Diamond M would visit negligence upon Exxon for not preventing the loading. But it must be remembered that Diamond M was an independent contractor on Exxon's platform. The crane, the drill collars, and the employees involved in the accident were under Diamond M's control. Consequently, aside from the fact that the Exxon representative did not order or authorize the loading of the tubular drill collars in seas running six to eight feet, Diamond M must cross the legal hurdle that a principal cannot be held answerable for failing to supervise an independent contractor. See McCormick v. Noble Drilling Corp., 608 F.2d 169 (5th Cir. 1979). This has not been done
 
 
 [4]
 In addition to citing Rule 59(d), although recognizing that Diamond M did not join Exxon's motion-indeed, initially opposed it-the trial judge stated that "at oral argument, Diamond M joined in the motion for remittitur." Accordingly, the trial court considered "the motion for new trial or, alternatively, remittitur as having been filed on behalf of Diamond M as well as Exxon." We cannot accept this reasoning. Diamond M's attempt to join Exxon's motion came after the 10 days allowed by Rule 59(b). A party may not belatedly join another litigant's motion and thereby circumvent the jurisdictional requirements of the rule
 
 
 [5]
 This view is shared by our colleagues in other circuits. See Peterman v. Chicago, Rock Island & Pacific R.R. Co., 493 F.2d 88 (8th Cir. 1974), cert. denied, 417 U.S. 947, 94 S.Ct. 3072, 41 L.Ed.2d 667 (1975); Tsai v. Rosenthal, 297 F.2d 614, 617 (8th Cir. 1961) ("Rule 59(d) has been interpreted by the courts as conferring jurisdiction upon the trial court to act upon its own initiative only during the ten days immediately following the entry of the judgment."); Jackson v. Wilson Trucking Corp., 243 F.2d 212 (D.C. Cir. 1957); Kanatser v. Chrysler Corp., 199 F.2d 610 (10th Cir. 1952), cert. denied, 344 U.S. 921, 73 S.Ct. 388, 97 L.Ed. 710 (1953). A leading commentator shares the same view. C. Wright, Law of Federal Courts § 95 at 469 (1976)
 
 
 [6]
 In addition, with regard to the service agreement struck by Coastal and Golden Meadows, we note that paragraph VII states:
 Notwithstanding anything to the contrary herein, it is understood that the duties of the crew of the vessel will be limited to navigation, maintenance and the loading and discharge, on board of liquid cargoes. The crew shall not be required, under any circumstances, to load or unload supplies or cargo other than aforesaid.
 (Emphasis added.) Given our construction of the indemnity contracts according to LaNasse, however, we do not decide the issue on the basis of this clause.