IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

---------------
No. 91-3022
---------------

JAY OLAN WILSON,                          Plaintiff,

                         versus

JOB, INC., ET AL.,                        Defendants.

                    ***************

FUGRO MCCLELLAND MARINE GEOSCIENCES, INC.,   Defendant-Appellant,

                         versus

EDISON CHOUEST OFFSHORE,                   Defendant-Appellee.

                    ***************

-------------------------------------------------------------------
          Appeal from the United States District Court
            for the Eastern District of Louisiana

-------------------------------------------------------------------

Before POLITZ. Chief Judge, BROWN AND SMITH, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

In a battle between vessel owner and time charterer to determine the appropriate share of the plaintiff's settlement to be borne by each of them, the district court entered summary judgment and later a final judgment in favor of vessel owner and against charterer because plaintiff's injuries were found to have been caused during an activity "arising out of charterer's actual drilling operations" and thus, according to the charter's reciprocal indemnity agreement, charterer was held liable and was,

therefore, unable to recover from the P & I policy in which it was expressly an additional assured. Charterer appealed the denial of its motion for summary judgment maintaining that plaintiff was engaged in the "operation of the vessel" when he was injured.[1] It also appealed from the grant of summary judgment in favor of owner against the charterer. Finding no error, we affirm in favor of owner.

## *The Injury*

This litigation arises out of an injury sustained by plaintiff Jay Wilson (Wilson) on October 9, 1989, while he was working aboard the R/V R.L. PERKINS (vessel). The vessel was owned by Edison Chouest Offshore, Inc. (Chouest), and on the date of Wilson's accident, was under time charter to Fugro-McClelland Marine Geoscience, Inc. (McClelland). The vessel was working pursuant to a written charter party which had been in effect between Chouest and McClelland since 1978.

McClelland chartered the vessel to act as a movable base from which it would conduct studies of the ocean floor.[2] Wilson was an

---

[1] The denial of a Rule 56 motion is an interlocutory order from which no appeal is available until the entry of judgment. Since the district court followed the denial of Charterer's motion for summary judgment with a Final Order dismissing Charterer's cross-claim, Charterer has the right to argue on appeal that the district court erroneously denied its Rule 56 motion. 10 C. Wright, A. Miller & M. Kane, Federal Practice and Procedure: Civil 2d § 2715 at 636, 638 (1983).

[2] McClelland is in the business of extracting and analyzing core samples taken from the seabed. In addition, McClelland's business entails preparing topographical surveys of the ocean floor. These core samples and topographical surveys are used by oil companies to determine if a drilling rig or a fixed platform can be anchored at a given location. McClelland obtains core samples by using a drilling rig, which has a small derrick and drawwork. The rig, along with equipment necessary to analyze the core samples and topographic equipment designed to survey the ocean floor, are normally placed semi-permanently on the stern deck of an offshore vessel. McClelland followed this normal procedure during its use of the R/V R.L. PERKINS.

employee of JOB Labor Contractors, Inc. (JOB), a company which occasionally provided contract labor to McClelland.

Wilson's accident occurred halfway through his twelve hour shift at 0630 hours while he was working atop an elevated McClelland equipment shack or "doghouse" located on the stern deck of the vessel. This shack was part of the McClelland core sampling equipment placed aboard the vessel by McClelland. In the course of McClelland's drilling activities, their drilling equipment habitually became muddy, and Wilson, just as he had done "every time we finished a hole," was rinsing off the equipment. In fact, Wilson had been instructed by Darryl Lindquist, a McClelland employee, that "everything on the back deck had to be cleaned, it all had to be rinsed down, just in case big shots from the office showed up."[3] Wilson had never before been on top of the doghouse, but on this occasion Lindquist "told [Wilson] specifically to get up on top of the doghouse and rinse it down." Wilson washed the doghouse with a high pressure wash wand, similar to the sort used at a car wash, that was hooked up to a compressor and an airtank.[4] Wilson climbed on a hundred-gallon water tank to reach the top of the doghouse and, once on top of it, he began washing the doghouse platform while holding the wash wand in one hand. He described the weather as "pretty rough, windy. I would say seven-foot seas." He approximated the winds to be at 30 to 40 miles per hour and stated

---

[3] At the time of the accident, the vessel was going back to the dock to get chemicals and mud to go back out on another McClelland job.

[4] Wilson was familiar with the force of the pressure washer as he had been using it for "a couple of hours" prior to his accident.

3

that the boat was constantly rolling from side to side. Wilson finished cleaning the doghouse platform and then, from his perch on the platform, he began to clean an adjoining McClelland mud tank two to three feet away. As he squatted or bent down to reach the sides of the mud tank with the wash wand, with only his toes in contact with the doghouse platform floor, the boat rolled to one side causing the plaintiff to lose his balance. Wilson tried to direct his fall to an "opening spot" by grabbing on to the mudtank for balance. He failed to keep his grip and fell approximately seven feet from the doghouse platform, down the side of the mudtank, on to some circulation pipes injuring his leg.

*Navigating Chartered Territory*

The charter party between McClelland and Chouest anticipated such an accident and addressed fixation of any resulting liability. Two relevant portions of the charter party form the basis of this particular dispute. By the "OWNER'S HOLD HARMLESS" provision, found at paragraph 18 of the charter, Chouest agreed

> to indemnify and hold harmless CHARTERER [McClelland] from and against all suits, claims, actions, demands, fines, penalties, and forfeitures . . . arising from or incurred as a result of the manning, navigating, operating, maintaining, victualing, supplying, and managing of the vessel....

McClelland, in the reciprocal "CHARTERER'S HOLD HARMLESS" provision, paragraph 19, correspondingly agreed

> to hold harmless and indemnify OWNER [Chouest] from and against any suits, claims, actions, and demands arising directly out of CHARTERER's actual drilling

4

operations....[5]

Each party claims that the other is bound under the terms of their respective "hold harmless" obligations. The question before us, then, comes down to this: Did Wilson's injury arise from "the manning, navigating, operating, maintaining, victualing, supplying, [or] managing of the vessel," or did his injury arise "directly out of [McClelland's] actual drilling operations." Our answer, however, does not turn on whether Wilson was a seaman. Therefore, despite McClelland's proffer, we decline to determine Wilson's seaman status.[6]

Likewise, the district court found Wilson's seaman status to be an irrelevant issue. In its order denying McClelland's and granting Chouest's motion for summary judgment, the district court, instead, considered the relevant portions of the charter and determined that "[t]he drilling and other equipment associated with the coring was owned and operated by McClelland, and the obligation of the Chouest crew did not extend to the operation of the

---

[5] Likewise, the charter party obligates each party to acquire insurance and to designate the other as an additional assured. Referring to the various insurance that Chouest was obligated to obtain, paragraph 13 (E) states: "All policies shall name CHARTERER, OWNER, and any additional parties designated by CHARTERER or OWNER, as coassureds." Similarly, Paragraph 19 provides: "CHARTERER'S Comprehensive General Liability Insurance shall name OWNER, and its affiliated or subsidiary companies as additional assureds[.]"

[6] Indeed, an employee of a contractor doing the ship's work could be a seaman; however, the relative liability of the charterer or the owner, the real issue here, will be determined not by the plaintiff's seaman status, but by the charter party which spells out the responsibilities of the charter parties. As a charter agreement for a vessel, the McClelland-Chouest charter is a maritime contract and the reciprocal indemnity clauses which it contains are to be construed according to maritime law. Lirette v. Popich Bros. Water Transport, Inc., 699 F.2d 725, 728 n. 11 (5th Cir. 1983); Transcontinental Gas Pipe Line Corp., v. Mobile Drilling Barge, 424 F.2d 684, 691 (5th Cir.), cert. denied sub nom. Ocean Drilling & Exploration Co. v. Signal Oil & Gas Co., 400 U.S. 832, 91 S.Ct. 65, 27 L.Ed.2d 64 (1970).

McClelland equipment."  Rejecting McClelland's argument that Chouest was obligated to indemnify McClelland because Wilson's injury arose out of the operation of the vessel, the district court, instead, held in favor of Chouest, the owner:

> Article 19 of the Time Charter provides that the Charterer [McClelland] will hold harmless and indemnify the Owner [Chouest] 'against any suits, claims, actions, and demands arising directly out of the Charterer's actual drilling operations . . . .'  Although drilling was not taking place at the time of the accident, the word 'actual' is not to be interpreted in its restrictive sense, but it is broad enough to encompass the plaintiff's activities at that time.  Moreover, plaintiff was not engaged in the operation of the vessel; rather, he was engaged in the special activities of the vessel, core sampling.  Since plaintiff's alleged injuries really arise out of McClelland's core sampling activities, the onus of providing insurance and indemnification properly falls on McClelland.

Minute entry of October 24, 1990 at p. 2.

In reviewing the district court's grant of summary judgment in favor of Chouest and its denial of McClelland's motion for summary judgment, we review all issues de novo, applying the same test as the district court.  LeJeune v. Shell Oil Co., 950 F.2d 267, 268 (5th Cir. 1992).  Summary judgment is proper if "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  F.R.Civ.P. 56(c).[7]

---

[7]     In appealing from the district court's final judgment, McClelland appeals both the district court's granting of Chouest's motion for summary judgment and the court's denial of McClelland's own motion for summary judgment.
   The procedural history of McClelland's appeal is as follows:  After Wilson initiated suits against JOB, McClelland, Chouest and their respective liability carriers as direct party defendants, Chouest filed a cross-claim against McClelland seeking contractual defense/indemnity, and a third-party demand for coverage as an additional assured against Americas Insurance Co. (AIC), the comprehensive general liability insurer of McClelland.
   McClelland and its primary maritime employer's liability insurer, the Hartford Accident and Indemnity Co, (Hartford), responded by filing a cross-claim against Chouest and its P & I carrier Standard Steamship Owners' Protection and Indemnity Association (Bermuda), Ltd. (Standard.)  That cross-claim, which is the

6

In the struggle to determine the source of Wilson's injuries and the liability resulting therefrom, the confusion perhaps stems from the fact that the vessel was designated by the United States Coast Guard as an oceanographic research vessel performing geotechnical surveying work.[8] The vessel's unique status as a registered coring and research vessel thus begs the question: Did McClelland's coring/drilling operations (which, by necessity, caused mud to cover the doghouse and thereby created the need to clean the doghouse) constitute "operation" of the research vessel by the owner under paragraph 18 of the charter or did they constitute "actual drilling operations" of the charterer under paragraph 19? In fact, both McClelland and Chouest attached affidavits and deposition excerpts to their respective motions for and responses in opposition to summary judgment. These affidavits

---

core of this appeal, sought coverage for McClelland as an additional assured under the P & I insurance provided to Chouest by Standard.

After the plaintiff settled for $130,000.00, to which Chouest contributed $32,500.00, and all other parties' related claims were either dismissed or settled, both Chouest's and McClelland's cross-claims and Chouest's third party demand were taken under submission by the district court on motions for summary judgment. By a Minute Entry dated October 24, 1990, the district court granted summary judgment in favor of Chouest providing for indemnity adverse to McClelland and AIC. The district court correspondingly denied McClelland's motion for summary judgment against Chouest and Standard. The district court's Final Judgment dismissed the cross-claim of McClelland and Hartford against Chouest and Standard, and entered judgment in favor of Chouest on its cross-claim and third-party demand against McClelland and AIC. Specifically, the court held McClelland and AIC liable *in solido* to Chouest "in the amount of $32,500.00, plus attorney's fees and costs of defense incurred in defending plaintiff's claim in the main demand, and court costs incurred in prevailing on its motion for summary judgment." McClelland and AIC, and McClelland and Hartford, filed their respective notices of appeal separately. AIC, however, later successfully moved for dismissal of its appeal as to Chouest. Thus, only McClelland/Hartford's appeal of the denial of their motion for summary judgment and of the granting of Chouest's motion for summary judgment remains.

[8] In accordance with 46 U.S.C. § 2101(18), the R/V R.L. PERKINS was designated as an oceanographic research vessel on July 6, 1989, such designation remained in effect until July 6, 1991. The vessel's designation was confirmed in a letter from J.P. Wysocki, Commander, U.S. Coast Guard, Officer in Charge, Marine Inspection.

7

and deposition excerpts, which were submitted by both parties as compelling evidence of the actual intent of the signatories to the charter, were wisely not pursued by the district court in its minute entry granting summary judgment in favor of Chouest and against McClelland. The district court recognized, and we agree, that a clear reading of the unambiguous, relevant portions of the charter party, namely clauses 18 and 19, resolves this dispute. When interpreting unambiguous provisions of a time charter, the charter party should be read as a whole, and a court may not look beyond the written language of the charter to determine the intent of the parties. Hardy v. Gulf Oil Corp., 949 F.2d 826, 834 (5th Cir. 1992); Atlantic Lines, Ltd. v. Narwhal, Ltd., 514 F.2d 726, 730 (5th Cir. 1975); Hicks v. Ocean Drilling and Exploration Co., 512 F.2d 817, 825 (5th Cir. 1975), cert. denied sub nom. H.B. Buster Hughes, Inc. v. Ocean Drilling and Exploration Co., 423 U.S. 1050, 96 S.Ct. 777, 46 L.Ed.2d 639 (1976).

*Reading The Charter As A Whole*

The charter's apportionment of the "mirror-image" indemnity obligations in paragraphs 18 and 19 is entirely consistent with McClelland's and Chouest's division of responsibility in the day-to-day operation of the vessel: McClelland was responsible for operating, manning, repairing, maintaining and cleaning its equipment, and, according to paragraph 7(a) of the charter, OWNER'S RESPONSIBILITY, Chouest

> agree[d] to operate and navigate the Vessel for trips involving CHARTERER's operations, to transport, berth, and carry such personnel, material and/or equipment as CHARTERER may direct, and to handle, control, operate,

8

maintain and repair the said mooring spread including all
safe anchor placing and retrieving, for which OWNER shall
be solely responsible.

Paragraph 12(a) of the charter, CREW, provides that "[t]he primary duties of the [Chouest] crew of the Vessel shall be to operate, navigate, and maintain the Vessel, including the mooring spread, and the crew shall not be required to load or unload [McClelland's] supplies or cargo." Finally, paragraph 14 of the charter, RESPONSIBILITY FOR CARGO, provides that "[t]he CHARTERER will be responsible for damage or loss of their cargo regardless of whosoever caused." The charter, therefore, is unambiguously clear that the obligations of Chouest as owner and McClelland as charterer were separate and distinct: Chouest did not operate the McClelland equipment, and McClelland did not operate the vessel. Thus, McClelland is incorrect in characterizing its core sampling activity as a "vessel" operation simply because the R/V R.L. PERKINS provided the base from which McClelland's core sampling was performed. Lanasse v. Travelers Insurance Co., 450 F.2d 580, 583-584 (5th Cir. 1971), cert. denied sub nom. Chevron Oil Co., California Co. Division v. Royal Insurance Co., 406 U.S. 921, 92 S.Ct. 1779, 32 L.Ed.2d 120 (1972). In fact, under McClelland's interpretation of Chouest's protection and indemnity obligations, the charter ends up as an absurdity: According to McClelland, Chouest would be entitled to defense/contribution/indemnity/additional insured status under Clause 19, yet it also would have to provide protection and indemnity coverage to McClelland for those identical liabilities

9

(claims arising out of McClelland's core sampling operation). This is not what the parties bargained for. The charter must be construed to make sense and to reflect the intent of the contracting parties. See Lirette v. Popich Bros. Water Transport, Inc., 699 F.2d 725, 728 n. 11 (5th Cir. 1983); M.O.N.T. Boat Rental v. Union Oil Co., 613 F.2d 576, 579 (5th Cir. 1980).

Furthermore, we have broadly construed language similar to the "arising out of charterer's actual drilling operations" language in clause 19 of the McClelland/Chouest time charter "to unambiguously encompass all activities reasonably incident or anticipated by the principal activity of the contract." Fontenot v. Mesa Petroleum Co., 791 F.2d 1207, 1214 (5th Cir. 1986). In Fontenot, the namesake plaintiff, an oil rig worker, was injured after disembarking from a helicopter when he lost his balance on a slippery heliport surface. In the ensuing multi-party donnybrook, the rig owner, Rowandrill, sought indemnity for paying its share of Fontenot's settled claim from the charterer, Mesa, on the basis of reciprocal indemnity agreements in the Rowandrill-Mesa charter. Under the charter, Mesa agreed

> to protect, defend, indemnify and save [Rowandrill] from and against all claims, demands and causes of action of every kind and character, without limit and without regard to the cause or causes thereof or the negligence of any party, arising in connection herewith in favor of [Mesa]'s employees, [Mesa]'s contractors or their employees other than [Rowandrill's employees or its subcontractors or their employees] on account of bodily injury, death or damage to property.

Id. at 1213 (emphasis added).

In denying indemnity to Rowandrill under this provision, the

10

District Court held that Fontenot's claim was not one "arising in connection herewith" because the use of the heliport was only incidental to the business of drilling a well or wells, the stated purpose of the contract. Id. The Fifth Circuit reversed, construing the charter broadly, and held:

> where the presence of the injured person at the scene of the injury is attributable to or might reasonably be anticipated by his employment responsibilities, then his injuries occur "in connection with" those responsibilities. It is irrelevant that the person is not at that moment performing services or that the injury results from an activity not encompassed by the employer's contractual undertakings.

Id. at 1215.[9]

Likewise, for purposes of McClelland's hold harmless agreement in Clause 19 of the McClelland/Chouest charter, Wilson's injury, sustained while cleaning McClelland equipment under McClelland's orders, was attributable to and reasonably anticipated by his employment responsibilities as a McClelland contractor employee. In fact, Paragraph 19 of the charter, CHARTERER'S HOLD HARMLESS, quite clearly designates those instances where McClelland will not hold Chouest harmless, and cleaning of McClelland equipment is NOT one of them:

> CHARTERER'S Comprehensive General Liability Insurance shall name OWNER, and its affiliated or subsidiary companies as additional assureds, but only with respect to actual drilling operations of the CHARTERER, and not with respect to the handling, operation, maintenance and control of the mooring spread, including placing and

_____

[9] The charter provision in Fontenot applied to any claim "arising in connection herewith", whereas the charter provision in the present case applies to claims "arising directly out of [McClelland]'s actual drilling operations." This is a distinction without a substantial difference. See Smith v. Tenneco Oil Co., Inc., 803 F.2d 1386, 1388 (5th Cir. 1986).

11

> retrieving of all anchors, for which OWNER shall be fully
> responsible, including liabilities, claims, and damages
> to third parties from which OWNER shall hold CHARTERER
> harmless.

Had McClelland specifically intended that Chouest be responsible for liability arising from cleaning the McClelland equipment on Chouest's vessel, then McClelland surely could have indicated as such. Indeed, McClelland, the author of the charter (according to Chouest's brief), explicitly provided that Chouest would be solely responsible for liability arising from the operation of the mooring spread and the placement of the vessel's anchors.[10] With such specificity as its norm, McClelland failed to assign Chouest the responsibility of cleaning, or for that matter, maintaining McClelland's equipment. It is equally clear that the charter party does not require Chouest, as the vessel owner-operator, to indemnify McClelland for liability arising from the cleaning of McClelland's equipment. Therefore, such cleaning, a McClelland responsibility, was an activity "arising directly out of" McClelland's "actual drilling operations." After all, "[a] contract of indemnity should be construed to cover all losses, damages, or liabilities which reasonably appear to have been within the contemplation of the parties . . . ." Corbitt v. Diamond M. Drilling Co., 654 F.2d 329, 333 (5th Cir. Unit A Aug. 1981). Wilson's claim arose directly out of McClelland's actual drilling

---

[10] For example, if McClelland improperly directed Chouest in the placement of the vessel's anchors, then, McClelland's improper direction notwithstanding, such a mistake, if a covered risk, would constitute a vessel liability to which Chouest's protection and indemnity coverage would respond.

12

operations.[11]

*Wrapping It Up*

Because no genuine issue exists as to any material fact concerning the application of clauses 18 and 19 of the McClelland-Chouest charter, McClelland is not entitled to be held harmless for Wilson's accident under Chouest's P & I policy as a matter of law, and, conversely, Chouest is entitled to be held harmless by McClelland.

The judgment of the district court is AFFIRMED.

---

[11] We do not reach the question, as we did in <u>Lanasse v. Travelers Insurance Co.</u>, 450 F.2d 580 (5th Cir. 1971), <u>cert. denied sub nom. Chevron Oil Co., California Co. Division v. Royal Insurance Co.</u>, 406 U.S. 921, 92 S.Ct. 1779, 32 L.Ed.2d 120 (1972), of whether a P & I underwriter could recover against its own additional assured in the face of an explicit policy provision waiving subrogation. <u>Lanasse</u>, 450 F.2d at 585.