Eddie Lee GRAHAM

v.

MILKY WAY BARGES, INC., et al.

Civ. A. Nos. 80–3684, 80–4016, 81–951 and 81–3616.

United States District Court, E.D. Louisiana.

June 29, 1984.

Harvey Lewis, Ross Scaccia, New Orleans, La., for plaintiff.

Robert Reich, Randolph Waits, Russell D. Pulver, Ted Alpaugh, Thomas Loehn, Clarence A. Frost, New Orleans, La., Stanley L. Perry, Galliano, La., Robt. Vosbein and Lynn Luker, New Orleans, La., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BEER, District Judge.

To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any conclusions of law constitute findings of fact, they are so adopted.

### Findings of Fact

#### Introduction

On September 5, 1980, the "jack up" barge or lift boat, STAR II, was in its jacked-up mode adjacent to an unmanned oil production platform located approximately five miles off the coast of Louisiana in the Gulf of Mexico. At approximately 2:30 a.m., that vessel capsized. Heavy weather generated by a tropical depression developing in the area played a part in this casualty.

The vessel drifted down on and collided with an adjacent platform and subsequently sank. Four men on board were thrown into the water as the vessel capsized. One man, Mr. Barton Daniel, is missing and presumed to have drowned, while two other men, Mr. Charles Taylor and Mr. Edward L. Graham, were injured. The Graham claim was settled before trial and the Daniel and Taylor claims were consolidated.

Mr. Taylor brought his cause of action under the Jones Act and General Maritime Law against the vessel owner and the platform owner contending seaman status. The survivors of Mr. Daniel brought suit under the Outer Continental Shelf Lands Act and the General Maritime Law. Following a pre-trial motion addressing jurisdiction, it was determined that the Daniel family's claim against the vessel owner would be dealt with under the terms of the Death on the High Seas Act. The Court reserved ruling on the jurisdictional question relating to the Daniel claim against the platform owner, but this cause of action settled on the eve of trial. This left the matter of Taylor's status as the sole remaining issue required to be decided by the jury.

The status question was submitted to the jury who found as a fact that Taylor was not a seaman. This finding concluded the jury's fact finding responsibilities but the Court retained the panel in an advisory capacity to address certain factual questions regarding insurance coverages and damages.

## The Parties

Chevron, U.S.A. is a corporation doing business in the State of Louisiana and in territorial waters off the coast of Louisiana and was the owner of certain fixed oil production platforms including the South Timbalier Block 24 "CM" platform located some five miles off the coast. The "CM" platform was unmanned and stood in approximately 54 feet of water.

Milky Way Barge Lines (Milky Way) is a Louisiana corporation owning and operating vessels known as jackup barges. At all material times, Milky Way was owner and operator of the M/V STAR II. Stock in the corporation was owned, and the corporation itself was operated, by three individuals: Mr. Rodney Terrebonne, Mr. Pershing St. Pierre and Mr. Sidney Duet. Mr. Duet, also a banker, handled the corporation's business affairs and Mr. Terrebonne and Mr. St. Pierre operated the jack-up vessels. At the time of the capsizing, the M/V STAR II was under time charter to Chevron but manned and operated by Milky Way.

Land and Offshore Services (LOS) is a Louisiana Corporation supplying offshore workers to the oilfield industry. At all times material to this litigation, LOS was working for Chevron as a painting subcontractor performing maintenance on Chevron's "CM" platform. Land and Offshore employed certain laborers including Mr. Charles Taylor, a painter/helper, and Mr. Barton Daniel, the painting crew foreman.

## The M/V STAR II

The M/V STAR II was a specially designed service vessel commonly employed in the offshore oil fields. Vessels of this type also are often used for platform related work activities such as serving as a work platform for maintenance crews and their equipment. The evidence indicates that these vessels are unique in their ability to move into position and jack up adjacent to the structure being worked on.

The STAR II's barge-like hull measured 62 feet long and 24 feet wide with a slight rake at the bow. She was self-propelled by twin screws, had a deck house located on the stern, and a bow area which was essentially clear except for a cargo crane on the port side. The deck house contained a bridge/control room, a two bunk cabin for the crew, a quarters room with 12 bunks for the subcontractor's crew, a galley and a storage room.

When functioning as designed, STAR II had the ability to jack itself out of the water on three legs; one amidships on the stern, one on the port bow and one on the starboard bow. Each leg was constructed of welded steel, cylindrical in shape, originally 60 feet in length but modified prior to the capsizing by lengthening to 90 feet with 30 foot extensions at each leg's base. These legs were raised or lowered by hydraulic motors powered by pumps driven by the vessel's main engines. In operation, hydraulic pressure was required to release the brakes from the gears which then were free to raise or lower the vessel. Each leg had its own actuator lever which could either be operated independently or simultaneously with the other leg control levers.

Mr. Pershing St. Pierre and Mr. Rodney Terrebonne, besides being part owners of Milky Way, also alternated as captain of the STAR II. In addition to the captain of the vessel, there was normally only one other individual carried in the crew, a deckhand/engineer.

## Relationship of the Parties

The STAR II was time chartered for an unspecified duration to Chevron from August 5, 1980 onward. It had been initially inspected for suitability for service by Mr. Robert Looper, Chevron's Transportation Supervisor, in mid-August, 1980. Chevron's legal department requested and reviewed the vessel's insurance policies and then approved it for use by Chevron but restricted that use to the "Inland Gulf States and water depth of 40' when elevating." The vessel was then placed at the disposal of Mr. Adrian Bruley, a technician in Chevron's Engineering Department in charge of sandblasting and painting offshore platforms.

Chevron had contracted with LOS for sandblasting and painting services of its platforms. LOS was specifically contracted to provide the supervision, labor, equipment and materials to perform this work. At Mr. Bruley's direction, LOS placed its crew and equipment aboard the STAR II in order to perform their platform maintenance work. Mr. Bruley specified which platform needed work and the STAR II with the LOS crew aboard was dispatched to the site. The responsibility of the captain of the STAR II included the operation and control of the vessel, whereas the sandblasting and painting operations were under the direction of the LOS foreman.

*The Capsizing*

Approximately 10 days prior to the capsizing, the STAR II moved onto location at Chevron's "CM" platform to conduct sandblasting and painting operations. These activities progressed prior to the casualty without difficulty.

On the morning of Wednesday, September 3, 1980, the STAR II jacked up to the well deck level of the platform which was approximately 15 feet above the water. A board was then placed across the gap from the vessel to the structure and work on the upper structure was commenced by the LOS crew.

By the afternoon of September 3, the weather began to deteriorate. The winds increased in velocity and became gusty. The seas grew choppy. By the morning of September 4, there were periodic rain squalls. This brought the painting and sandblasting operations to a halt.

At approximately 5:30 a.m. on Thursday, September 4, Captain Terrebonne reported to the Chevron dispatcher in Leeville (Mr. Cuneo), seeking to be transported to the STAR II so that he could relieve Captain St. Pierre. Chevron maintains a vessel dispatcher in Leeville on a 24 hour basis. The dispatcher's duties were not clearly defined but it's clear that he serves as a coordinator for the transportation of men and materials between Chevron's base in Leeville and the various offshore facilities on the outer continental shelf. The dispatcher's office also served as a center for reports, inquiries and calls to and from the various facilities. Contact with Chevron's platforms and work vessels is maintained through a company radio transmitting station and company owned radios placed aboard various vessels involved with Chevron's Gulf based operations. The STAR II was equipped with such a radio.

Captain Terrebonne arrived by crewboat and boarded the STAR II at approximately 8:00 a.m., and relieved Captain St. Pierre who departed by crewboat for the return trip to Leeville.

At approximately 7:45 a.m., Mr. Cuneo, the Chevron dispatcher, received a printed weather forecast from a weather service under contract with Chevron. This forecast was one of two forecasts regularly received by the dispatcher each day (supplemental bulletins were issued if severe weather posed a threat in the Gulf). Copies of these forecasts were normally sent offshore by this dispatcher to Chevron field foremen via boat or helicopter. If requested by a field unit, the dispatcher would usually broadcast the forecast over Chevron's radio.

During the morning of September 4, a number of requests for weather information were received by Mr. Cuneo. Rather than respond individually, he decided to make a blanket broadcast to all Chevron field units. This forecast, in pertinent part, indicated the following:

... A weak 29.91 inch tropical low pressure zone is moving WNW over Southeast Louisiana. The following conditions are expected:

Thursday—E to NE wind and waves. Tides above normal. Working conditions generally fair at exposed locations and good at sheltered locations except in thunderstorms.

Forecast from 6 AM Sept. 4 to 6 AM Sept. 5:

Waves: (South Timbalier 24) 3/7 ft. ENE SHFT 3/7 ESE 6 AM FRI.

Weather: LA/TEX Coast—Partly cloudy to cloudy. Scattered showers and

thunderstorms. Gusts to 60 mph and temporary wave increases of 4 to 6 ft. in the most severe thunderstorms.

This forecast was broadcast at approximately 8:30 a.m. and was received by Captain Terrebonne on the STAR II. Subsequently, Terrebonne received a call from Captain St. Pierre on board the crewboat telling him that he would check on Chevron's possible decisions about when vessels might be advised to come inshore because of weather conditions. Consistent with this, when Captain St. Pierre arrived at Chevron's Leeville facility at approximately 11:00 a.m. he did have a discussion about the situation with Mr. Cuneo. There is a conflict in the testimony of these two men as to that discussion. St. Pierre contends that Cuneo told him that he would bring STAR II in if the weather worsened. Cuneo, however, testified that he had responded that such a decision was the responsibility of the captain. I doubt if either was clearly that categoric.

Late that Thursday afternoon, the seas were in the range of 5 to 6 feet; the winds were in the 20 miles per hour range. Captain Terrebonne testified that he did not try to contact Chevron directly regarding weather reports, nor did they attempt to contact him. Around 6:30 p.m., Captain Terrebonne thought that the weather might be clearing up.

Meanwhile, at 5:30 p.m., on September 4, Mr. Jesse Guidry relieved Mr. Cuneo as Chevron's dispatcher. At approximately 8:00 p.m., Mr. Guidry was made aware of a "special weather bulletin." Apparently the bulletin had been first transmitted at around 3:30 p.m. That bulletin read in part:

... A 29.88 inch tropical depression is developing over the SE Louisiana Coast and North Central Gulf. It is centered near 29.0 N, 90.5 W or approximately over Terrebonne Bay. Maximum sustained winds are 25 MPH, gusts to 60 MPH in squalls.

Forecast from 3:30 p.m. Sept. 4 to Sept. 5:

Waves 60 ft. Depth LA/TEX Coast—4/5E Inc 6/8 E by 6 PM FRI.

Wind, LA/TEX Coast—E 20/25 Inc E 25/30 by 6 PM FRI.

Weather—Cloudy, squalls. Gusts to 60 mph and temporary wave increases of 4 to 6 feet in the most severe squalls.

Mr. Guidry did not broadcast this bulletin. He did not feel that the weather conditions forecasted were a cause for concern.

At approximately 1:00 a.m. on the morning of September 5, Captain Terrebonne went to bed. At around 2:15 a.m., Captain Terrebonne was awakened by the sound and effect of waves striking the hull of the STAR II. The weather was squally, it was raining heavily and the wind and seas appeared to have picked up. Waves were continuing to strike the hull. Captain Terrebonne went to the bridge of the vessel for the purpose of attempting to raise the hull of the vessel above the seas. He started the engines, achieved the hydraulic pressure necessary to jack up and then activated the three lifting levers to raise the hull. The stern and starboard forward lifting devices functioned but the port forward lifting device did not function. Terrebonne adjusted the hull back to a level attitude and then attempted to raise the port forward leg alone; he was unsuccessful in this attempt. Captain Terrebonne and his deckhand next went to the engine room to check for hydraulic leaks or other possibly apparent problems which might explain the difficulty being encountered with the port lifting device. None were found. Captain Terrebonne then ordered the deckhand to pass the word to the LOS crew to don life jackets and move onto the platform immediately. He returned to the bridge to try once more to raise the port forward leg but again failed. Captain Terrebonne then went to the galley to confirm that everyone had left the vessel. He found Graham, Daniel and Taylor were still on board. They all grabbed life jackets and followed the captain in an attempt to reach the platform. As the four men crossed the deck, the hull of the STAR II lifted on a wave and then capsized to port, throwing the men into the water.

Captain Terrebonne, Mr. Graham and Mr. Taylor were rescued from the Gulf after floating for some eight hours. They suffered pain and chemical burns, exposure and some physical injuries. Mr. Daniel was not seen again nor has his body been recovered.

The STAR II was a total loss as a result of this casualty. LOS also lost sandblasting and painting equipment which had been placed on the vessel's foredeck. After the STAR II capsized, it floated downwind until it hit and damaged Chevron's adjacent South Timbalier 24 "CC" platform.

*The Insurance Coverage Questions*

The owners of the STAR II notified their insurance agent, Mr. Horrace Herrin, of the casualty and filed a proof of loss with the hull and protection and indemnity (P & I) insurers shortly after the incident. The various insurers of the STAR II denied coverage claiming that certain express warranties of the policies had been violated by the insured and, as a consequence, coverage had been suspended or voided. These factual issues were submitted to the jury in its advisory capacity.

As has been previously noted, STAR II was originally constructed with 60 foot legs. The insurors who accepted this risk and issued hull and P & I policies (primary and excess) did so with certain limitations. The STAR II would be covered as long as (a) the operation of the STAR II was confined to "the inland waters of the Gulf States;" (b) the vessel would not be elevated in water depths in excess of 40 feet; and (c) the vessel would not be elevated in seas of five feet or more, and if the vessel was elevated and seas increased to five feet, or were predicted to rise to five feet, the vessel would be lowered to a floating position.

The jury heard evidence relating to the question of whether these limitations constituted express warranties, a breach of which would void coverage regardless of the question of causation, or whether these limitations were special conditions, requiring a causal connection between a breach of the condition and the capsizing before coverage would be voided.

Milky Way also contended that if insurance coverage on the STAR II had been voided, such voiding was the result of the negligence of its insurance agent, Horrace Herrin Agency, or the insurance broker contacted by the agent, Continental Underwriters, Ltd., who had the burden to obtain additional coverage on the STAR II as requested by Milky Way. This request for additional coverage arose out of the owners' decision to extend the length of the legs of the vessel from 60 feet to 90 feet, thereby allowing it to work in deeper waters. Milky Way contended that actions of the agent and broker (or failures to act) led them to believe that the extended coverage *had* been obtained; the agent and broker, on the other hand, contended that the owners knew that no such coverage had been obtained.

Finally, the broker's errors and omissions insurer, St. Paul Fire and Marine Insurance Company, claimed that it did not owe its insured a duty to defend against these alleged acts of negligence because of a 2½ year delay in notification of the claim under its policy. St. Paul argued that such a delay created irreparable harm to their ability to prepare a defense and that such actions voided coverage under the professional liability policy.

■ After considering evidence (and argument) on these issues, the jury made findings in an advisory capacity. As to the issue involving the characterization of the express limitations in the Hull and P & I policies, the jury concluded that these terms were not warranties and that the insurers had a duty to defend Milky Way. Being of the view that this finding represents a valid conclusion reached after proper consideration of the evidence and the law, this finding of the jury is adopted by me. The limitations contained in the policies were not express warranties and, therefore, coverage existed at the time of the casualty. This determination effectively renders the remaining insurance issues moot in view of the fact that they were

raised alternatively in the event it was determined that no coverage existed.

### Damages as to Plaintiff Taylor

█ The final remaining issue submitted to the jury was the question of damages, if any, due Mr. Taylor for his claims under the General Maritime Law against Milky Way and Chevron. In that regard, the jury returned an award of $176,500.00. This finding by the advisory jury seems to me to be very much on the high side but not so high as to be unacceptable. Accordingly, I adopt it.

### Conclusions of Law
### The Question of Liability

The primary causes of the capsizing of the M/V STAR II were the inattention of Captain Terrebonne and the unseaworthiness of the STAR II. More specifically, Captain Terrebonne was remiss in (a) failing to be aware of, and, thus, to take into account the safe operational limits of his vessel and (b) failing to properly monitor weather conditions which posed a threat to the safety of his vessel and crew. The vessel was unseaworthy as evidenced by the captain's inability to raise or jack-up the vessel on its port forward leg, thereby allowing seas to strike the hull of the vessel and eventually capsize her. A contributing cause of the casualty was Chevron's negligence in sending the STAR II beyond its navigational limits and, once having done so, in failing to order the vessel back to safety in adverse weather or, at least, to supply her captain with available weather forecasts which indicated that dangerous conditions were developing. The division of liability as between Milky Way and Chevron is determined to be seventy (70) percent and thirty (30) percent respectively.

### Milky Way's Negligence

At the time of the capsizing, the STAR II was under time charter to Chevron. The standard charter party in effect between Milky Way and Chevron stated in part:

Owner shall man, operate, and navigate the vessel. The vessel shall prosecute its trips and perform its services with dispatch, as directed by the charterer, but responsibility for the management and navigation and operation of the vessel shall remain at all times in the owner ... and nothing herein contained shall be construed as making this a demise.... Owner hereby agrees to defend, indemnify, and hold harmless Chevron against all claims for ... damages, whether to person or property, and howsoever arising in any way directly or indirectly connected with the possession, navigation, management and operation of the vessel.

The agreement also required that Milky Way procure and maintain insurance naming Chevron as an additional insured in the policies.

█ Under this time charter agreement, Milky Way remained responsible for providing and maintaining a seaworthy vessel and for supplying a captain (and crew) who would retain full operational control. The responsibilities of a vessel owner operating under such an agreement are well established. If the owner retains control of his vessel, he remains liable for damages arising out of its operation whether the charter be by voyage or for time. *See e.g., Agrico Chemical Co. v. M/V BEN W. MARTIN,* 664 F.2d 85, 91 (1981); *Continental Oil Co. v. Bonanza Corp.,* 677 F.2d 455, 462 (5th Cir.1982).

Jack-up barges, unique in their functional ability to convert from seagoing watercraft to "land-based" work platforms at the throw of a lever, may require unique precautions to ensure their safety in either of these modes. The captain of such a vessel must be aware of the operational limitations of his vessel because a jack-up barge in its raised mode, analogous to a fish out of water, can be victim of the damaging effects of the winds and waves. The captain of such a vessel which is already raised above building seas may find that he has no option other than to jack the vessel higher and higher in an attempt to maintain a sufficient air gap between the hull and the seas. Thus, it is necessary that operators of such vessels establish operational guidelines to ensure the safety of

their vessel and those who are aboard. Although the legs of the STAR II had been extended from 60 feet to 90 feet prior to the casualty, the evidence indicates that safe operating limitations of the vessel (either with the original or the modified legs) were never fully determined. Operation of the STAR II, by a captain possessing little knowledge of the safe weight, depth, wind and sea capabilities of his vessel, in an open reach of the Gulf of Mexico constituted negligence which is properly attributed to the vessel owner.

■ As master of the STAR II, Captain Terrebonne had a duty to monitor weather conditions in the South Timbalier Block 23–24 area to ensure its safety. *Boudoin v. J. Ray McDermott*, 281 F.2d 81 (5th Cir.1960). In this regard, the Captain had at his disposal a Chevron radio which provided direct communication with Chevron's vessel dispatching facility in Leeville, a VHF radio providing ship-to-ship and ship-to-shore communication as well as continuous NOAA weather broadcasts, and public radio and T.V. broadcasts. The evidence shows that Captain Terrebonne did little to monitor the weather conditions which posed a threat to the safety of his vessel. Some three hours prior to the casualty he went to bed leaving no watch on duty to keep an eye on sea and wind conditions which should have caused concern.

By the time Captain Terrebonne was awakened by the sounds of waves striking the hull of the STAR II, the seas were already too rough for him to jack down. His only option was to attempt to raise the hull above the force of the seas. Captain Terrebonne's failure to post a weather watch or to obtain up-dated weather forecasts, especially in view of the fact that his vessel was in its jacked-up mode, standing in very deep water and already swaying uneasily due to the effects of existing winds and waves, is attributable to the vessel owner.

Finally, it was the failure of the vessel's port forward leg's lifting mechanism which sealed the fate of the STAR II. When Captain Terrebonne was unable to raise the

vessel's hull above the pounding seas, it was only a matter of time before the vertical lifting force of the sea and the horizontal push of the winds and the waves would capsize the STAR II. This unseaworthiness further constituted negligence for which the vessel owner must be answerable.

*Chevron's Negligence*

■ A contributing cause of the casualty was Chevron's negligence in sending the STAR II out to perform work on a rig which stood in unsheltered waters at a depth which exceeded the safe navigational limits of STAR II. Chevron company policy required that its legal department review and approve each chartered vessel's insurance coverage prior to sending that vessel into service. Once approved, the vessel was placed on an interoffice memo entitled "Insured Boat and Barge List" which listed vessels available for service and the navigational limits established for each vessel. The STAR II was restricted to the "Inland Gulf States and water depth of 40 feet when elevating." The "Insured Boat and Barge List" was sent to each of Chevron's supervisors and field foremen, including Mr. Looper, Chevron's Transportation Supervisor, and Mr. Bruley, the technician in charge of maintenance on offshore oil and gas platforms. Despite Chevron's own directive not to send the STAR II to elevate in waters deeper than 40 feet, Mr. Bruley and/or Mr. Looper dispatched the vessel to perform maintenance on Chevron's "CM" platform which stood in approximately 54 feet of unprotected water.

Chevron failed to provide the Captain of the STAR II with weather forecasts which gave indication of the perils encountered. A special weather bulletin prepared by a weather service under contract to Chevron was sent to Chevron's Leeville vessel dispatching facility. This bulletin (customarily forwarded from the front office to the radio dispatcher) failed to reach the dispatcher for several hours after its issuance. When the report reached the dispatcher, no broadcast followed to vessels such as

STAR II. Having sent the STAR II into unsheltered waters beyond her navigational limits, these actions on the part of Chevron deprived STAR II of weather information which could have played a part in a decision to jack-down and seek sheltered waters at a time when such could have been safely accomplished.

Furthermore, I find that Chevron's Leeville centered operations in the Gulf of Mexico as they had to do with the dispatching, operating and recalling of so-called lift type vessels was such that certain duties did arise by reasons thereof. Among those duties was an obligation to participate in a decision making process aimed at deciding when operations in the Leeville-Gulf area which were controlled by Chevron should be shut down.

Chevron's lack of such participation was a contributing factor in this casualty.

*The Question of Indemnity*

Chevron contends that even if its own negligence contributed to the casualty, any resulting liability falls upon Milky Way under the indemnity provision of the time charter. Moreover, Chevron claims its liability was insured under the terms of a standard P & I policy obtained by Milky Way in accordance with the terms of the charter. The policy incorporated the typical provision insuring liabilities of the insured as a shipowner. Coverage, says Chevron, was expressly extended to it as an additional insured and the underwriters' right of subrogation against Chevron was waived.

Neither Milky Way nor its insurers are responsible for negligent actions of Chevron's shore based establishment which made the decisions regarding which chartered vessel should be dispatched to perform the work on the "CM" structure. Nor is Milky Way or its insurers answerable for negligent action of Chevron's dispatcher in failing to forward weather bulletins to Chevron chartered vessels working offshore. Such acts were not related to "the operation, navigation, or management" of the STAR II, as those terms are meant to apply to one who acts as "vessel owner." Chevron's negligence arises out of actions taken as an offshore oil producer and owner of certain fixed platforms requiring continuous maintenance.

■ Even if there was an operational relationship between the Chevron employees and the navigators of the vessel, the indemnity provision does not provide Chevron with immunity from the negligence of its own employees. Liability of this sort can arise only from the plainly expressed intention of the parties, spelled out in unmistakable terms. *Batson-Cook Company v. Industrial Steel Erectors*, 257 F.2d 410 (5th Cir.1958).

■ Similarly, the P & I policy does not cover Chevron as an additional insured under the circumstances of the capsizing because Chevron did not become liable "as owner of" the vessel. The distinction between a charterer acting as vessel owner and in some other capacity is recognized in this circuit. In *Lanasse v. Travelers Ins. Co.*, 450 F.2d 580, 583 (5th Cir.1971), a seaman aboard a vessel was injured while transfering a welding machine by crane from the vessel to a platform owned by Chevron. The district court found that the sole cause of the accident was the negligence of Chevron's crane operator and the Court of Appeals faced the issue of whether Chevron was covered as an additional assured under a P & I policy similar to the policy at issue here. The court held that "[t]he Trial Judge was ... right in holding that the P & I policy did not cover this claim because Chevron, as an additional insured ... did not become liable 'as owner of' the vessel." The court went on to declare that there must be at least some causal operational relation between the vessel and the injury.

In *Lanasse*, the vessel caused no part of the injury and so the charterer bore the full cost of the accident. In *Dow Chemical Co. v. Tug "THOMAS ALLEN,"* 349 F.Supp. 1354, 1364 (E.D.La.1972), the Court applied the *Lanasse* logic to a joint tortfeasor situation. Dow owned a barge pulled by the insured's tug. The P & I policy on the tug

named Dow an additional assured as charterer. When the barge operator insisted on proceeding through a channel despite the absence of pipeline charts, the tug's captain acquiesced. The tug ruptured a gas pipeline and the ensuing fire injured a seaman on the barge and damaged the barge. The Court found the barge and tug operators jointly negligent in causing the injury. Accordingly, the Court limited Dow's coverage under the policy to that attributable to the tug's negligence.

The Court stated:

Dow's liability in this case arises from its negligence as a barge owner, or more importantly, a service company anxious to perform services for its customers without delay. No such coverage was provided by [the P & I insurers].

*Id.* at 1364–5.

This same logic applies to the case presently before the Court. Chevron's liability for the capsizing of the STAR II arises from its acts as platform owner concerned, among other things, with the maintenance and functioning of its platforms; not out of negligent acts as owner/operator of a jack-up barge.

The Fifth Circuit again addressed these issues presented by P & I coverages in *Wedlock v. Gulf Miss. Marine Corp.*, 554 F.2d 240 (5th Cir.1977). In *Wedlock*, McDermott, the barge owner, chartered a tug and its crew to tow the barge. An employee of the tug was injured on the barge. McDermott settled with the injured employee and sought indemnification under a P & I policy on the tug naming him as an additional insured. The policy did not list the barge as a covered vessel. The court held that "the insurance policy does not purport to cover McDermott's liability for acts of negligence committed qua barge-owner, rather than qua charterer." *Id.* at 242. *Lanasse* was specifically approved in the court's interpretation of the policy:

Lanasse, however, establishes only that showing "some causal relation" brings the liability within the insurance policy on the covered vessel. It does not address the question of the extent of such coverage. It is entirely consistent with *Lanasse* to say that the insurance policy covers liability arising from the accident only to the extent the accident is caused by the covered vessel.

The *Wedlock* court went on to point out:

In *Lanasse*, the vessel caused no part of the injury; hence the charterer was unable to recover as an additional assured and bore the full cost of the accident. In the case at bar, negligence of the tug's crew was one of two proximate causes of the accident, and hence we should require the tug's insurer to bear some but not all of the loss. We leave the cost of the accident to be shared by the tug-owner and barge owner in the amount of their respective contributions. *Lanasse*, after all, emphasizes that Chevron could not recover from the insurer of the tug because Chevron's liability arose qua platform operator rather than qua shipowner (or charterer). Similarly, McDermott's liability arose as that of a barge-owner, not as an owner or charterer of the covered vessel.

*Id.* at 244. *See, also, St. Paul Fire & Marine Ins. v. Vest Transp.*, 666 F.2d 932 (1982); *American Motorists Ins. Co. v. American Employer's Ins.*, 447 F.Supp. 1314 (W.D.La.1978), *remanded on other grounds*, 600 F.2d 15 (5th Cir.1979).

The case of *Offshore Logistics Services v. Mutual Marine Office*, 462 F.Supp. 485 (E.D.La.1978), is instructive as to the effect of various types of charter agreements on the interpretation of P & I "additional insured" clauses. In *Offshore*, a crane operator injured while being transported ashore in a crewboat from a rig in the Gulf of Mexico sued the vessel charterer. The charterer settled with the plaintiff and brought an action against the vessel owner's insurer for indemnity as an additional insured under the policy. The district court held that where the agreements between the vessel owner and a *demise* charterer manifested intimate affiliation and indicated the intent to constitute the charterer as owner pro hac vice of the vessel, the charterer's negligent acts were committed

as "owner" and therefore were covered by the terms of the vessel owner's policy.

The language of the charter agreement here involved indicates that "nothing herein contained shall be construed as making this a demise." Taking the directive of the recent Fifth Circuit jurisprudence on the subject, I conclude that Chevron's negligence was a contributing cause of the capsizing of the STAR II and was not committed as vessel "owner." Such negligence does not, therefore, fall under the additional insured provisions of Milky Way's P & I policy.

The cost of the casualty must be shared between Milky Way and Chevron.

*Damages as to Plaintiff Daniel*

My Minute Entry of November 2, 1983, indicates that the claims by the Daniel family brought against Milky Way arise under the Death on the High Seas Act, 46 U.S.C. Section 761, *et seq.* By the terms of DOHSA, recoveries for wrongful death are limited to pecuniary loss. *Mobil Oil Corp. v. Higginbotham,* 436 U.S. 618, 98 S.Ct. 2010, 56 L.Ed.2d 581 (1978). Considering all of the evidence submitted to the Court pertaining to the question of damages, it is my conclusion that the sum of $400,000.00 represents fair and adequate compensation in satisfaction of the claims made on behalf of Barton Daniel and his survivors.

*Damages as to Land and Offshore Services*

LOS has made a claim for damages arising out of the loss of painting and sandblasting equipment which had been placed on the deck of the STAR II, the cost of which totaled some $61,139. LOS also files a claim for reimbursement of $2,618, covering personal effects lost by its work crew at the time of the capsizing. I conclude that payment of $60,000 will represent fair and adequate compensation to satisfy these claims, considering various counter-balancing factors.

Finally, the Court recognizes a compensation lien in favor of LOS for compensation benefits and medicals paid to plaintiff Taylor by LOS in the amount of $5,039.58.